DRINKER BIDDLE & REATH LLP
Warren von Credo Baker (WB 1100)
John J. D'Attomo (JD 9013)
David S. Almeida (DA 8341)
191 North Wacker Drive, Suite 3700
Chicago, IL  60606
(312) 569-1000

*Proposed Substitute Counsel to Janice Grubin, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| FOOD MANAGEMENT GROUP, LLC, | Case No. 04-22880 (ASH) |
| KMA I, Inc., | Case No. 04-22890 (ASH) |
| KMA II, Inc., | Case No. 04-22891 (ASH) |
| KMA III, Inc., and | Case No. 04-22892 (ASH) |
| BRONX DONUT BAKERY, INC., | Case No. 04-20312 (ASH) |

                    Debtors.                    (Jointly Administered)

-------------------------------------------------------x

JANICE B. GRUBIN, in her capacity
as Chapter 11 Trustee for Debtors
FOOD MANAGEMENT GROUP, LLC,                    Adversary No. 06-A-_____
KMA I, Inc., KMA II, Inc., KMA III, Inc.,
and BRONX DONUT BAKERY, INC.,

                    Plaintiff,

            v.

ANASTASIOS (a/k/a TOM) GIANOPOULOS;
CONSTANTINE (a/k/a GUS) GIANOPOULOS;
ANASTASIA (a/k/a ANNE) GIANOPOULOS;
ANASTASIA (a/k/a STACEY) GIANOPOULOS;
64 EAST 126TH REALTY LLC; NEWELL
FUNDING LLC; GOLDEN AGE MORTGAGE
CORP.; DEVELOPMENT STRATEGIES
COMPANY, LLC; THOMAS R. BOREK;
ROBERT J. STOCKEL; ROBERT L. RATTET;
JONATHAN S. PASTERNAK; RATTET,
PASTERNAK & GORDON OLIVER, LLP;
ALAN H. ROTHSCHILD; ROTHSCHILD
& PEARL, LLP; and NODINE REALTY
CORPORATION,

                    Defendants.

-------------------------------------------------------x

## COMPLAINT

Plaintiff JANICE B. GRUBIN, as Chapter 11 Trustee (the "Trustee") for Debtors FOOD

MANAGEMENT GROUP, LLC, KMA I, Inc., KMA II, Inc., KMA III, Inc., and BRONX

DONUT BAKERY, INC. (collectively, the "Debtors"), by and through her undersigned counsel,

and for her Complaint against the Defendants states as follows:

## NATURE OF THE ACTION

This action seeks to recover damages arising from an unlawful scheme whereby the

Defendants colluded to effect a fraudulent sale of estate assets to and for the benefit of the

Debtors' principals, Anastasios Gianopoulos and Constantine Gianopoulos (collectively, the

"Gianopoulos Brothers"), without disclosing such to the Court.  The scheme was designed to

circumvent a contractual provision requiring that the Gianopoulos Brothers terminate their

involvement as Dunkin' Donut franchisees – as well as this Court's order prohibiting the sale of

estate assets to insiders – by using a "straw man" purchaser as a front for the Gianopoulos

Brothers.  In addition to the Gianopoulos Brothers, the defendants include (a) persons who

breached their professional and fiduciary duties by failing to disclose and/or discover the

fraudulent conduct; (b) persons who conspired with the Gianopoulos Brothers or otherwise

facilitated the fraudulent scheme; and (c) persons who profited from the fraudulent scheme.  The

conduct alleged herein gives rise to claims of fraudulent concealment, breach of fiduciary duty,

negligence, conspiracy, aiding and abetting, unjust enrichment, and fraud on the court.

## PARTIES AND RELEVANT PERSONS

1.    Plaintiff Janice B. Grubin is the duly appointed and acting Chapter 11 Trustee for

the Debtors.

2.      Debtor Food Management Group, LLC ("FMG") is a limited liability company organized under the laws of the State of New York.

3.      Debtor KMA I, Inc. is a corporation organized under the laws of the State of New York.

4.      Debtor KMA II, Inc. is a corporation organized under the laws of the State of New York.

5.      Debtor KMA III, Inc. is a corporation organized under the laws of the State of New York.  (KMA I, Inc., KMA II, Inc., and KMA III, Inc. are hereinafter collectively referred to as the "KMA Entities.")

6.      Debtor Bronx Donut Bakery, Inc. ("Bronx Donut") is a corporation organized under the laws of the State of New York.

7.      Defendant Anastasios Gianopoulos ("Tom Gianopoulos") is an individual and was, at all times relevant, a resident of the State of New York and claims to be the shareholder and member of the Debtors.  Tom Gianopoulos is an insider of the Debtors as defined in 11 U.S.C. § 101(31).

8.      Defendant Anastasia Gianopoulos ("Anne Gianopoulos") is an individual and a resident of the State of New York.  Anne Gianopoulos is Tom Gianopoulos's wife.  Anne Gianopoulos is an insider of the Debtors as defined in 11 U.S.C. § 101(31).

9.      Defendant Constantine Gianopoulos ("Gus Gianopoulos") is an individual and a resident of the State of New York.  Gus Gianopoulos is Tom Gianopoulos's brother.  Gus Gianopoulos is an insider of the Debtors as defined in 11 U.S.C. § 101(31).

10.    Defendant Anastasia Gianopoulos ("Stacey Gianopoulos") is an individual and a resident of the State of New York.  Stacey Gianopoulos is Gus Gianopoulos's wife.  Stacey Gianopoulos is an insider of the Debtors as defined in 11 U.S.C. § 101(31).

11.    Defendant 64 East 126th Realty LLC ("64 East") is a limited liability company organized under the laws of the State of New York.

12.    Defendant Newell Funding LLC ("Newell Funding") is a limited liability company organized under the laws of the State of New York.

13.    Defendant Golden Age Mortgage Corp. ("Golden Age Mortgage") is a Florida corporation registered to do business in the State of New York.

14.    Defendant Development Strategies Company, LLC ("Development Strategies") is a limited liability company organized under the laws of the State of New York.

15.    Defendant Thomas R. Borek ("Borek") is an individual and a resident of the State of New York.  On information and belief, Borek is a principal of 64 East, Newell Funding, Golden Age Mortgage, and Development Strategies.

16.    Defendant Robert J. Stockel ("Stockel") is an individual and a resident of the State of New York.  On information and belief, Stockel is a principal of 64 East, Newell Funding, Golden Age Mortgage, and Development Strategies.

17.    Defendant Robert L. Rattet ("Rattet") is an individual and, on information and belief, a resident of the State of New York.  Rattet is an attorney-at-law and a principal in the law firm of Rattet, Pasternak & Gordon Oliver, LLP.

18.    Jonathan S. Pasternak ("Pasternak") is an individual and, on information and belief, a resident of the State of New York.  Pasternak is an attorney-at-law and a principal in the law firm of Rattet, Pasternak & Gordon Oliver, LLP.

19.     Defendant Rattet, Pasternak & Gordon Oliver, LLP (the "Rattet Law Firm") is a limited liability partnership registered under New York law.  The Rattet Law Firm is a law firm with offices located at 550 Mamaroneck Ave., Suite 510, Harrison, New York.

20.     Defendant Alan H. Rothschild ("Rothschild") is an individual and, on information and belief, a resident of the State of New York.  Rothschild is an attorney-at-law and a principal in the law firm of Rothschild & Pearl, LLP.

21.     Defendant Rothschild & Pearl, LLP (the "Rothschild Law Firm") is, on information and belief, a limited liability partnership registered under New York law.  The Rothschild Law Firm is a law firm with offices located at 245 Main Street, Suite 330, White Plains, New York.

22.     Defendant Nodine Realty Corporation ("Nodine Realty") is a corporation organized under the laws of the State of New York that is owned and/or controlled by the Gianopoulos Brothers.

## JURISDICTION AND VENUE

23.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(a) and (e).

24.     This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding arises under, arises in, and is related to the above-captioned cases under title 11 of the United States Code.

## FACTUAL ALLEGATIONS

25.    Prior to 2002, the Gianopoulos Brothers operated various Dunkin' Donut franchises in the State of New York through some 27 corporate entities that were owned or controlled by Gus Gianopoulos (the "Gus Companies").

26.    In 2000, Dunkin' Donuts commenced litigation against the Gus Companies and the Gianopoulos Brothers for, among other things, failure to pay franchise fees.  On October 18, 2002, the Gus Companies, the Gianopoulos Brothers, and Dunkin' Donuts entered into a settlement agreement resolving the litigation (the "Settlement Agreement").  **(Ex. A)**.

27.    A critical feature of the Settlement Agreement was the requirement by Dunkin' Donuts that the Gianopoulos Brothers terminate their involvement as Dunkin' Donuts franchisees.   The Settlement Agreement set forth a two-step process for the Gianopoulos Brothers to exit the Dunkin' Donuts franchise system.

28.    As the first step, the Settlement Agreement permitted the Gus Companies to assign their rights and franchise agreements to one or more New York corporations.  The KMA Entities and Bronx Donut (the "Franchisees") were formed on November 19, 2002 to serve as the assignees of the franchise agreements held by the Gus Companies.  Upon information and belief, pursuant to the terms of the Settlement Agreement, certain franchise agreements and other assets were transferred to the KMA Entities and Bronx Donut in late 2002 or early 2003.   As the second step, the new corporations (the KMA Entities and Bronx Donut) were required to sell the franchises by July 31, 2005, subject to various conditions stipulated in Paragraph 5 of the Settlement Agreement.

29.    Among other conditions to the sale, Paragraph 5 of the Settlement Agreement provided that (a) the purchaser could not be related to the Gianopoulos Brothers or associated

with the Gianopoulos Brothers in any way, and (b) the Gianopoulos Brothers and their families could not hold a direct or indirect interest in the franchises after the sale.

30.    Specifically, Paragraph 5(E) of the Settlement Agreement provided, in relevant part, as follows:

> The prospective transferee(s) must not be an immediate family member of any Franchisee who is a signatory to this Agreement or be associated in any way with the past or present management of any of the Franchises; nor may any member of the Franchisees' families have any interest, directly or indirectly, in any of the Franchises following the transfer, except as an assignee of any notes or security agreements executed by a transferee. . . .

31.    Paragraph 5(F) of the Settlement Agreement further provided that "[t]he transfer [of the franchises] must in all respects be arms-length."

32.    On June 1, 2004, Debtor FMG, and on June 2, 2004, Debtors KMA Entities and Bronx Donut, filed for relief under Chapter 11 of the Bankruptcy Code (the "Petition Dates").

33.    On June 10, 2004, the Court entered an order approving the Rattet Law Firm as counsel for the Debtors.

34.    From approximately June 1, 2004 through September 2, 2005, the Debtors operated as debtors-in-possession.

35.    At all relevant times herein, the Debtors were insolvent.

36.    By Order entered on July 30, 2004, the Bankruptcy Court approved the appointment of Elizabeth J. Austin as Examiner.

37.    By Order entered on September 2, 2005, the Bankruptcy Court appointed Janice B. Grubin as the Chapter 11 Trustee.

38.    By Complaint filed June 16, 2006, the Trustee sought recovery of millions of dollars that the Gianopoulos Brothers, their family members, and related and affiliated persons and corporations wrongfully caused or allowed to be transferred from the Debtors.

*The Rattet Law Firm Is Retained As Counsel To*
*The Debtors Despite Its Lack of "Disinterestedness"*

39.    On June 4, 2004, the Debtors filed an application seeking approval to retain the Rattet Law Firm as their general bankruptcy counsel under section 327(a) of the Bankruptcy Code. **(Ex. B)**. According to the application, the attorneys of the Rattet Law Firm "possess considerable experience representing debtors in proceedings before this Court and are well suited to represent the Debtors in the instant proceedings."

40.    Pursuant to section 327(a) of the Bankruptcy Code, an attorney may be retained to represent the debtor only if the attorney is "disinterested" and does not hold or represent an interest adverse to the estate.

41.    Pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Rule 2014"), an attorney applying to be retained as counsel for the debtor must submit a verified statement setting forth his or her "connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants . . ."

42.    Rule 2014 imposes a duty to disclose all "connections" with the debtor, creditors, or any other party in interest, and does not allow an attorney to selectively disclose only those connections he or she deems relevant. Further, Rule 2014 requires disclosure of all connections with the debtor, creditors, or any other party in interest even where those connections do not rise to the level of a conflict of interest.

43.    An attorney serving as counsel for a debtor is under a continuing obligation to supplement his or her Rule 2014 statement so as to disclose conflicts, potential conflicts, or connections with the debtor, creditors, or any other party in interest that arise after counsel's initial application and disclosure.

44.     On June 4, 2004, Pasternak filed an "Affidavit of No Adverse Interest" on behalf of the Rattet Law Firm stating: "[n]either Deponent nor his firm has any connection with the Debtors, their creditors, or any other party in interest herein or their respective attorneys." The Affidavit of No Adverse Interest filed by the Rattet Law Firm further stated, "Deponent's firm does not hold nor represent any interest adverse to the Debtors herein or its estate in the matters upon which it is to be engaged." **(Ex. C)**.

45.     On June 10, 2004, in reliance on the Affidavit of No Adverse Interest filed by Pasternak which stated that the Rattet Law Firm (a) had no connection with the Debtors or any other party in interest, and (b) did not hold or represent any interest adverse to the Debtors, the Court entered an order approving the retention of the Rattet Law Firm as counsel for the Debtors.

46.     Rattet has maintained a close personal and professional relationship with Borek for approximately 30 years.

47.     While simultaneously representing the Debtors in their bankruptcy cases, the Rattet Law Firm also represented Golden Age Mortgage (an entity owned or controlled by Borek), as evidenced by documents showing that the Rattet Law Firm received payments for legal services rendered on behalf of Golden Age Mortgage on or about December 21, 2004, January 26, 2005, and July 25, 2005. **(Ex. D)**.

48.     On information and belief, while simultaneously representing the Debtors, the Rattet Law Firm also represented One Gateway Plaza (an entity owned or controlled by Borek) as reflected by billing entries of the Rattet Law Firm, one of which indicates that services were rendered to One Gateway Plaza on March 9, 2005. **(Ex. E)**.

49.     At no time did the Rattet Law Firm disclose its simultaneous representation of the entities controlled by Borek – Golden Age Mortgage or One Gateway Plaza – to the Court, the

Examiner, or the Trustee, except in a general manner in a vague footnote in Rattet's March 16, 2006 affidavit **(Ex. U)** that was prepared at the Court's request to provide information regarding an improper bid submitted on March 24, 2005 **(Ex. H)** in connection with the sale of the Debtors' assets.

50.     In addition to this simultaneous representation of Golden Age Mortgage and One Gateway Plaza during the Debtors' bankruptcy cases, prior to the Petition Dates, the Rattet Law Firm (or its predecessor, Rattet & Pasternak) represented Borek and/or entities owned or controlled by Borek.

51.     In or about 2001, the Rattet Law Firm (or its predecessor, Rattet & Pasternak) represented Borek in certain litigation captioned *Thomas Borek as Trustee of the Borek, Stockel & Marden, C.P.A., P.C. 401k Profit Sharing Plan & Trust v. Larry R. Reznick*, Case No. 2001-09458, filed in the Supreme Court of Westchester County, New York (the "Borek Profit Sharing Plan Litigation").

52.     In or about 2001, the Rattet Law Firm (or its predecessor, Rattet & Pasternak) represented Golden Age Mortgage as a creditor in the matter *In re: United Marine, LLC,* Case No. 00-37511 (CGM), filed in the United States Bankruptcy Court for the Southern District of New York (the "United Marine Bankruptcy").

53.     At no time did the Rattet Law Firm disclose its prior representation of Borek and/or his entities in the Borek Profit Sharing Plan Litigation or the United Marine Bankruptcy to the Court, the Examiner, or the Trustee, except in a general manner in a vague footnote in Rattet's March 16, 2006 affidavit **(Ex. U)** that was prepared at the Court's request to provide information regarding an improper bid submitted on March 24, 2005 **(Ex. H)** in connection with the sale of the Debtors' assets.

9

54.    In addition to failing to disclose connections with Borek and/or entities owned or controlled by Borek, the Rattet Law Firm failed to disclose connections with entities owned or controlled by the Gianopoulos Brothers.  On or about November 6, 2002, Nodine Realty (an entity owned or controlled by the Gianopoulos Brothers) filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 02 B 23687) (the "Nodine Realty Bankruptcy").

55.    Pasternak of the Rattet Law Firm (or its predecessor, Rattet & Pasternak) represented Nodine Realty in the Nodine Realty Bankruptcy.

56.    In connection with the Nodine Realty Bankruptcy, in or about April 2003, Borek (through Golden Age Mortgage) provided $230,000 in financing to Nodine Realty to fund its Chapter 11 reorganization.  Pasternak of the Rattet Law Firm (or its predecessor, Rattet & Pasternak) represented Nodine Realty in connection with this transaction with Golden Age Mortgage.  Rothschild represented Golden Age Mortgage in connection with this transaction.

57.    At no time did the Rattet Law Firm disclose its prior representation of Nodine Realty in the Nodine Realty Bankruptcy to the Court, the Examiner, or the Trustee.

### The Bidding and Sale Process

58.    On November 23, 2004, the Court approved the retention of Keen Consultants, LLC ("Keen") to assist the Debtors in marketing and selling substantially all of the Debtors' assets.  Keen undertook due diligence and marketing activities designed to obtain the highest and best offers for the Debtors' assets.  Subject to the terms of a confidentiality agreement, Keen made information concerning the Debtors' finances, leases, franchise agreements, and other matters available at its offices and on its Web site.

59.    On or about January 10, 2005, the Debtors filed a motion seeking court authorization to conduct an auction of substantially all of their assets and approval of certain

proposed Bidding Procedures that were attached to the motion (the "Auction Motion"). The Rattet Law Firm drafted the Bidding Procedures including the required bid documents. One of the required bid documents drafted by the Rattet Law Firm was a document entitled "Offer & Bidder Registration Form" (the "Bidder Registration Form") that was attached to the Bidding Procedures as Exhibit 1. **(Ex. F)**. The Bidding Procedures required each bidder to put down a deposit which deposit would be used as part of the purchase price of the winning bidder.

60.     On or about February 22, 2005, the Court granted the Auction Motion and entered its Order authorizing the Bidding Procedures and sale process. **(Ex. G).**

61.     Pursuant to the Bidding Procedures, a "Qualified Bid" required an executed Bidder Registration Form and was required to be "a good faith, bona fide, offer to purchase."

62.     Pursuant to the Bidding Procedures, a bid was a "Qualified Bid" only if it included financial information evidencing a commitment for financing or the ability to promptly consummate the transaction.

63.     The Bidding Procedures required that each bidder "fully disclose the identity of each entity that will be bidding for a[n] Asset or otherwise participating in such bid, and the complete terms of any such participation."

64.     The Bidding Procedures also required that each person bidding for the purchase of the Debtors' assets submit an executed Bidder Registration Form certifying that the bidder was not an insider of the Debtors. Specifically, Paragraph "d" of the Bidder Registration Form required a certification that "neither Bidder nor any of its officers, directors, shareholders, members or partners is a shareholder, employee, or affiliate of the Debtors, or a relative of a shareholder, employee, or affiliate of the Debtors."

65.    In addition to the certification required by the Bidder Registration Form, the Settlement Agreement provided that the transferee of the Franchises "must not be an immediate family member of any Franchisee . . . or be associated in any way with the past or present management of any of the Franchises; nor may any member of the Franchisees' families have any interest, directly or indirectly, in any of the Franchises following the transfer . . ."

66.    The Settlement Agreement further required that the sale of the Franchisees occur through a process that was "in all respects . . . arms-length."

67.    The Rattet Law Firm, including Rattet and Pasternak, had knowledge of the terms of the Bidding Procedures and the Settlement Agreement.  Among other things, the Bidder Registration Form was attached to the Auction Motion that the Rattet Law Firm drafted and filed and which motion referenced the terms of the Settlement Agreement, and Rattet purportedly prepared and personally delivered a letter dated March 22, 2005 (**Ex. L,** discussed below) to Borek in which he referenced and acknowledged the terms of the Bidder Registration Form and the Settlement Agreement.

### *The Rattet Law Firm Had Notice Or Knowledge That The Gianopoulos Brothers Were Involved In The 64 East Bid But Failed To Disclose That Information*

68.    Prior to March 1, 2005, Rattet arranged for the Gianopoulos Brothers to discuss potential funding arrangements with Borek relative to the purchase of Debtors' assets.

69.    Between March 1, 2005 and March 16, 2005, Borek and the Gianopoulos Brothers had discussions concerning the impending sale of estate assets and arrangements for the purchase of the Debtors' assets.

70.    As early as March 12, 2005, a Purchase and Sale Agreement identifying 64 East as the purchaser of the Debtors' assets was in existence in both electronic form and hard copy, as evidenced by a print date of March 12, 2005 appearing in the header on several pages of the

Purchase and Sale Agreement, including the page identifying 64 East as the purchaser of the Debtors' assets. **(Ex. H)**. This Purchase and Sale Agreement was prepared by the Rattet Law Firm.

71.    Further, on March 17, 2005, a document was created on the computer system of the Rattet Law Firm bearing the title: "form contract cash only-Borek.doc." **(Ex. I)**.

72.    As reflected by a March 17, 2005 time entry by Pasternak in the billing records of the Rattet Law Firm describing his work as "Prepare rider to contract form re: break up fee" and by data retrieved from the Rattet Law Firm computer system, a rider to the 64 East Purchase and Sale Agreement was created by Pasternak on March 17, 2005. **(Group Ex. J)**.

73.    On information and belief, the Rattet Law Firm billing records contained billing entries that disguised the work performed in preparing the bid submitted by Borek in the name of 64 East (the "64 East/Borek Bid"). For example, immediately after his time entry for time expended drafting the rider for the 64 East/Borek Bid, Pasternak made a time entry as follows: "Telephone conference with Stalking Horse buyer re: changes to Stalking Horse contract." **(Ex. K)**.

74.    On information and belief, on or about March 14, 2005, upon learning of an impending $16 million bid for the purchase of Debtors' assets by ZPG Restaurant Associates, LLC ("ZPG/Matrix"), the Gianopoulos Brothers moved forward with their plan to surreptitiously acquire the Debtors' assets for their benefit.

75.    Two days later, on March 16, 2005, Rattet, Borek, and the Gianopoulos Brothers participated in a three and a half (3½) hour meeting at the Rattet Law Firm. Borek was not represented by his own counsel at this meeting. The Gianopolous Brothers were represented only Rattet, if at all.

76.     During his May 2, 2006 examination conducted pursuant to Federal Rule of Bankruptcy Procedure 2004, Rattet testified, under oath, that, during the March 16 meeting with Borek, he told Borek that if he (Rattet) became aware of any kind of interest of the Gianopouloses in the Borek bid transaction then he (Rattet) would have an obligation to report it to the Court.

77.     On or about March 18, 2005, a signed contract for $16 million and a bid deposit in the amount of $1.6 million was received by the Debtors from ZPG/Matrix.  As a condition of its bid, ZPG/Matrix demanded that the contract of sale be countersigned by the Debtors that day. However, according to the Rattet Law Firm, the Debtors' principal, Tom Gianopoulos, could not be reached by telephone for this purpose.

78.     On or about March 18, 2005, the Debtors sought  immediate court approval to enter into a Purchase and Sale Agreement with ZPG/Matrix for $16 million, purportedly due to the unavailability of Tom Gianopoulos.  By Order entered March 18, 2005, the Court granted such approval and scheduled a hearing for March 24, 2005 to consider the break up fee requested by ZPG/Matrix.

79.     On March 22, 2005, Rattet met with Borek at the offices of the Rattet Law Firm at which time the 64 East/Borek Bid and/or the involvement or potential involvement of the Gianopoulos Brothers in the 64 East/Borek Bid was discussed.

80.     Immediately following this meeting and before Borek left his offices, on March 22, 2005, Rattet prepared a letter that he purportedly personally handed to Borek that stated, in relevant part:

*       *       *

        With respect to your potential purchase of the above-referenced Debtors' assets pursuant to 11 U.S.C. Sections 363 and 365, please find enclosed herewith the following:

14

(1)     A copy of an agreement, dated October 2002, as amended, between Dunkin' Donuts Incorporated and its affiliates, and the Debtors.

(2)     A copy of the Bidding Procedures and Auction Order.   Please note that the Auction Order supersedes the printed Bidding Procedures, and to the extent the latter are inconsistent with the Order, the Order controls.

Please pay particular attention to Paragraph "5" of the Settlement Agreement with respect to transfer of the franchises. Because subparagraphs "E" and "F" of the Paragraph 5 require an "arms-length transaction" and that the transferee cannot be "associated in any ways [sic] with the past or present management," ***I strongly urge you to ensure that Tom and/or Gus have individual bankruptcy counsel in connection with any security provided to you or otherwise, and insist that they do so.***

If you have any questions, please do not hesitate to contact either myself or Joe Corneau.

*        *        *

(emphasis added) **(Ex. L)**.

81.     Rattet has testified that his March 22 letter was intended as a "warning" to Borek. According to Rattet, a "warning" was necessary because of "an innuendo" of an improper arrangement between Borek and the Gianopoulos Brothers in connection with the 64 East/Borek Bid.  Rattet has further conceded that the warning was prompted by "some concerns" he had with respect to the involvement of the Gianopoulos Brothers in the 64 East/Borek Bid.  These "concerns" were sufficiently serious that Rattet had the March 22 letter drafted during the course of his March 22 meeting with Borek and personally handed the letter to Borek at the conclusion of the March 22 meeting at the Rattet Law Firm.  Rattet knew enough of the improper arrangement to include a "warning" regarding "security."

82.     Even though Rattet knew that Borek was represented by – and shared offices with – Rothschild, Rattet did not share his concerns or a copy of the March 22 letter with Rothschild.

83.    Even though Rattet had "concerns," he did not write a similar "warning" letter to the Gianopolous Brothers.

84.    Even though prior to the March 22 meeting Rattet had arranged to have Robert R. Leinwand, Esq. ("Leinwand") of Robinson Brog Leinwand Greene Genovese & Gluck P.C. serve as bankruptcy counsel to Borek in connection with the sale of the Debtors' assets, Rattet did not share his concerns or a copy of the March 22 letter with Leinwand.

85.    Notwithstanding his concerns with respect to the Gianopoulos Brothers' involvement in the 64 East/Borek Bid, and despite his acknowledged obligation to report any Gianopolous interest in the bid to the Court, Rattet did not disclose such information or the March 22 letter to the Court, the Examiner, or later, to the Trustee, nor did Rattet insist or otherwise direct that the Gianopoulos Brothers not be involved in the 64 East/Borek Bid in the letter.

86.    On March 23, 2005, the day after the meeting where Rattet and Borek discussed the 64 East/Borek Bid and/or the involvement or potential involvement of the Gianopoulos Brothers in the 64 East/Borek Bid, and the day before the scheduled March 24 court hearing, the Rattet Law Firm assisted Borek in preparing the bid Borek would submit purportedly on behalf of 64 East. Later that day, Alan Rothschild (transaction counsel for 64 East) contacted the Rattet Law Firm and asked that the Rattet Law Firm pick up the completed 64 East/Borek Bid from Rothschild's law office, an office that Rothschild shares with Borek.

87.    The afternoon of March 23, 2005, Rattet drove his associate (Joseph Corneau, *Esq.*) to Rothschild's office and picked up the 64 East/Borek Bid package which included only the Purchase and Sale Agreement executed by Borek (**Ex. H**) and the deposit check.

88.    The 64 East/Borek Bid package that Rattet picked up from the Rothschild Law Firm did not include the requisite executed Bidder Registration Form.

89.    The 64 East/Borek Bid never included the requisite executed Bidder Registration Form.

90.    Rothschild had notice or knowledge of the arrangement whereby Borek, through 64 East, would serve as a front for the Gianopoulos Brothers in connection with the bid for the purchase of the Debtors' assets.  On information and belief, Rothschild intentionally failed to submit the requisite Bidder Registration Form because Rothschild had notice or knowledge that the 64 East/Borek Bid was being submitted as a front for the Gianopoulos Brothers and that the Bidder Registration Form required a certification that 64 East and/or Borek were not related to or an affiliate of the Debtors or their principals.  On information and belief, Rothschild intentionally failed to ensure that 64 East/Borek fully disclosed the identity of each person participating in the 64 East/Borek Bid.

91.    Rattet and the Rattet Law Firm knew or should have known of the arrangement whereby the 64 East/Borek Bid would involve the Gianopoulos Brothers.

92.    Rattet and the Rattet Law Firm failed to disclose to the Court that the 64 East bid package did not contain the requisite executed Bidder Registration Form from 64 East/Borek and failed to ensure that 64 East/Borek fully disclosed the identity of each person participating in the 64 East/Borek Bid.

93.    At the March 24, 2005 hearing to approve ZPG/Matrix as the stalking horse bidder, Rattet advised the Court of the $21 million bid submitted by 64 East, even though the bid did not constitute a Qualified Bid and did not include the Bidder Registration Form as required.

94.     The Court entered an Order approving 64 East as the stalking horse bidder with a $250,000 break up fee (the "Break Up Fee") and 64 East tendered a $2.1 million deposit into escrow representing 10% of its bid amount.

95.     Thereafter, on April 15, 2005, the deadline for the submission of bids, ZPG/Matrix submitted an offer and deposit for the purchase of Debtors' assets in the approximate amount of $27 million.

96.     The ZPG/Matrix offer was substantially higher than any other offers received.  As a condition of its offer, ZPG/Matrix required a private sale and the cancellation of the scheduled auction.

97.     On or about April 26, 2005, the Court entered an Order canceling the auction and approving ZPG/Matrix as the proposed purchaser in a private sale.

### The Rattet Law Firm Acts As Attorney And/Or
### Agent For Borek With Respect To The Bid Deposit

98.     Subsequent to the Order canceling the auction and approving ZPG/Matrix as the proposed purchaser in a private sale, Rattet took steps on behalf of Borek and in furtherance of Borek's interests to have the $2.1 million bid deposit returned to 64 East/Borek.

99.     On information and belief, Rattet did not take any similar steps with any other bidders' deposits.

100.     Unbeknownst to the Trustee, on or about July 8, 2005, the Rattet Law Firm – and not counsel for 64 East or Borek – drafted a stipulation that purported to release 64 East/Borek from "all rights and obligations in connection with the execution of the 64 East Contract, including the Court-approved bidding procedures."  **(Ex. M)**.  Additionally, the proposed stipulation provided for the return of the $2.1 million deposit to 64 East and the award of the Break Up Fee to 64 East.  Further, the proposed stipulation purported to release 64 East from all

claims the Debtors might have arising out of the 64 East contract, the Bidding Procedures, "or otherwise arising out of the transaction contemplated by the 64 East Contract." Thus, if the stipulation that Rattet drafted for 64 East/Borek while representing the Debtors was executed by the Examiner, such stipulation would purportedly release the claims that the Debtors now are making against Borek and 64 East arising from the 64 East/Borek Bid.

101.    The Examiner refused to enter into the stipulation proposed by the Rattet Law Firm.

102.    The Trustee was never apprised of this stipulation.

103.    Unable to obtain the Examiner's consent to the stipulation, Rattet then proceeded – at a cost to the Debtors' estates – with efforts to have Dunkin' Donuts formally reject 64 East as a prospective franchisee.

104.    Despite being aware of Borek's criminal record, and despite being informed that Dunkin' Donuts would reject Borek's franchise application for that reason, Rattet undertook efforts to have a franchise application submitted to Dunkin' Donuts on Borek's behalf, so that he could return the deposit to Borek, his friend of approximately 30 years.

105.    On July 13, 2005, Joseph Corneau, Esq. of the Rattet Law Firm wrote to counsel for Dunkin' Donuts referencing the 64 East bid and requesting a meeting between Borek and Dunkin' Donuts. **(Ex. N)**.

106.    On July 26, 2005, Corneau again wrote to counsel for Dunkin' Donuts enclosing a copy of the Purchase and Sale Agreement signed by Borek. **(Ex. O)**. Corneau once again requested a meeting between Borek and Dunkin' Donuts.

107.    On August 30, 2005, Rattet wrote to counsel for Dunkin' Donuts requesting that Dunkin' Donuts provide Borek as the backup bidder with an application to become a Dunkin' Donuts franchisee. **(Ex. P).**

108.    On September 6, 2005, subsequent to the date of the Trustee's appointment, Rattet again wrote to counsel for Dunkin' Donuts and enclosed a Confidential Franchise Request executed by Borek and financial information relating to the 64 East/Borek Bid. **(Ex. Q).**

109.    Dunkin' Donuts declined to complete a formal review of Borek's franchise application pending the receipt of further information concerning his criminal history.

110.    Unaware that the $2.1 million deposit tendered by 64 East was funded by the Gianopoulos Brothers, (*see* ¶ 112 *infra*), unaware of the involvement of Rattet and Pasternak in the 64 East/Borek Bid, and unaware of Rattet's efforts to get the 64 East bid deposit returned to Borek, the Trustee returned the deposit to counsel for 64 East pursuant to the request of Leinwand.

111.    The $2.1 million bid deposit was then deposited into the attorney trust account at the Rothschild Law Firm. Thereafter, on or about January 5, 2006, Rothschild caused the $2.1 million bid deposit to be disbursed by signing checks drawn on the attorney trust account of the Rothschild Law Firm as follows:

| *Payee* | *Amount* |
|---|---|
| Defendant Newell Funding | $112,375.00 |
| Defendant Golden Age Mortgage | $21,606.25 |
| Defendant Golden Age Mortgage | $10,500.00 |
| Defendant Development Strategies | $20,412.88 |
| Defendant Rothschild Law Firm | $500.00 |

| Defendant Stacey Gianopoulos | $967,865.46 |
| Defendant Anne Gianopoulos | $967,865.47 |

(**Ex. R**).

### *The Fraud Is Discovered In March 2006*

112.    Approximately one year after the 64 East/Borek Bid was submitted, it was discovered that 64 East was a front for the Gianopoulos Brothers and that 64 East submitted its bid at the behest of the Gianopoulos Brothers and that the Gianopolouses funded the deposit. Specifically, in or about March 2006, a letter addressed to 64 East dated March 24, 2005 was made public by the U.S. Bankruptcy Court.   The March 24 letter bore the names of Nodine Realty, Tom Gianopoulos, Gus Gianopoulos, Anne Gianopoulos, and Stacey Gianopoulos.   (**Ex. S**).   The March 24 letter was also signed by each of Tom Gianopoulos, Gus Gianopoulos, Anne Gianopoulos, and Stacey Gianopoulos.

113.    The March 24 letter states that Nodine Realty and/or the Gianopoulos Brothers requested that 64 East "act as the Purchaser" in connection with the sale of the Debtors' assets. The March 24 letter further states that Nodine Realty and/or the Gianopoulos Brothers directed that $2.1 million loaned to them by Newell Funding, a company owned or controlled by Borek and Stockel, be paid to 64 East "to utilize as a deposit" under the 64 East/Borek bid contract for the purchase of the Debtors' assets.   The $2.1 million check for the bid submitted by 64 East/Borek to the Debtors was drawn on Rothschild's Newell Funding Trust Account.   (**Ex. T**).

114.    The March 24 letter was prepared by Rothschild, and is included in the closing binder prepared by Rothschild in connection with a $2.6 million loan from Newell Funding to Nodine Realty, a loan that was guaranteed by the Gianopouloses.

115.    The March 24 letter references "Bankruptcy Proceeding: Food Management Group, L.L.C., et al" and the 64 East/Borek Bid.

116.    The March 24 letter provides for the disclosure of the "relationship between us" or "the matters surrounding this transaction and our participation" to "the Court, Trustee or any creditor of the Debtor" but only if inquiry is made into such matters.

117.    The March 24 letter, that Rothschild prepared in aid of the 64 East/Borek Bid, violates and countervails this Court's Order entered on February 22, 2005 and the Bidding Procedures that require that each bidder "fully disclose the identity of each entity that will be bidding for a[n] Asset or otherwise participating in such bid, and the complete terms of any such participation."

118.    On information and belief, the Gianopoulos Brothers approached Borek and requested that Borek procure a loan for them in the amount of $2.6 million from Newell Funding, an entity owned or controlled by Borek and Stockel. The Gianopoulos Brothers subsequently closed a $2.6 million loan from Newell Funding on March 24, 2005 and $2.1 million of these funds were transferred to the attorney trust account of Borek's counsel, the Rothschild Law Firm on that date. At the loan closing held at the offices shared by Rothschild and Borek, the Gianopoulos Brothers and their wives each signed the March 24 letter confirming that they requested that Borek submit the bid to purchase the Debtors' assets in the name of 64 East and in fact funded the bid with the proceeds of the $2.6 million loan.

119.    At no time was it disclosed to the Court, the Examiner, or the Trustee that the Gianopoulos Brothers had fronted money for purposes of secretly acquiring the Debtors' assets in connection with the Court-approved sale of the Debtors' assets. At no time did the Gianopoulos Brothers disclose to the Court, the Examiner, or the Trustee their relationship with 64 East and/or Borek in connection with the pending sale of the Debtors' assets. At no time did any participant in this scheme disclose to the Court, the Examiner, or the Trustee the relationship

between the Gianopoulos Brothers and 64 East and/or Borek in connection with the pending sale of the Debtors' assets.

### *Rattet, And The Rattet Law Firm, Had Notice Or Knowledge Of The Involvement Of The Gianopoulos Brothers In The Fraudulent Bid*

120.    On or about March 14, 2006, Rattet submitted an affidavit as requested by the Court concerning the 64 East/Borek Bid.  **(Ex. U)**.  Rattet stated in Paragraph 21 of his affidavit, "[u]ntil March 23, 2005, we had no knowledge that 64 East was in fact going to make an offer" to purchase the Debtors' assets.

121.    In reality, a Purchase and Sale Agreement identifying 64 East as the purchaser of the Debtors' assets was in existence in both electronic form and hard copy at least 11 days earlier, on March 12, 2005.  The hard copy form of the Purchase and Sale Agreement identifying 64 East as the purchaser bears a computer-generated "print date" of March 12, 2005.

122.    The Purchase and Sale Agreement bearing the printed date of March 12, 2005 was created on, and printed from, the Rattet Law Firm computer system.

123.    According to billing records of the Rattet Law Firm, an attorney with the Rattet Law Firm, Lawrence Reinlieb, Esq., billed 4.6 hours to the estate on March 12, 2005 for work associated with the drafting of a contract for the purchase of Debtors' assets.  **(Ex. V)**.

124.    The billing records of the Rattet Law Firm for the day prior, March 11, 2005, reflect that Reinlieb, Rattet, and Pasternak had a conference "re: contracts."  **(Ex. W)**.

125.    Rattet and Rothschild had notice or knowledge of the agreement between the Gianopoulos Brothers and 64 East pursuant to which Borek funded the 64 East bid at the behest of the Gianopoulos Brothers and served as a front for the Gianopoulos Brothers in connection with the purchase of the Debtors' assets.

126.    Rattet and the Rattet Law Firm had notice or knowledge that the Gianopoulos Brothers would undertake to purchase the Debtors' assets with a loan from Borek notwithstanding admonitions and warnings against such course of action.

127.    Rattet and the Rattet Law Firm had notice or knowledge that the Gianopoulos Brothers were reluctant to terminate their involvement as Dunkin' Donut franchises.

128.    Rattet and the Rattet Law Firm had notice or knowledge of suspicious dealings between the Gianopoulos Brothers and Borek in connection with the 64 East/Borek Bid sufficient to cause Rattet to not only send a warning letter to Borek concerning any involvement by the Gianopoulos Brothers in the 64 East/Borek Bid, but also to say that the Gianopolouses should obtain counsel with respect to "any security provided to [Borek]" – a letter that Rattet purportedly personally handed to Borek on March 22, 2005, the day of his meeting with Borek, and one day before Rattet picked up the 64 East/Borek Bid from Rothschild's office.

129.    Rattet and the Rattet Law Firm had notice or knowledge that 64 East conducted no due diligence through Keen prior to submitting its $21 million bid for the purchase of Debtors' assets on March 23, 2005.  Specifically, 64 East did not execute a confidentiality agreement with Keen, did not obtain a bidder's package from Keen, and did not receive any information from Keen pertaining to the Debtors' business prior to submitting its $21 million bid.  Unlike the 17 other bids, Keen had no involvement in the 64 East/Borek Bid.  Rather, Borek received the offering memorandum directly from the Rattet Law Firm at the March 16, 2005 meeting with Rattet, the Gianopoulos Brothers and Borek.

130.    Although Rattet allegedly "strongly urged" Tom and/or Gus to obtain bankruptcy counsel and "insisted that they do so," Rattet did nothing to ensure that they had.

## COUNT I – Fraudulent Concealment
(Against Borek)

131.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 130 as if fully set forth herein.

132.    On or about February 22, 2005, the Court entered an order granting the Auction Motion and adopting the Bidding Procedures.

133.    The Bidding Procedures required that each bidder "fully disclose the identity of each entity that will be bidding for a[n] Asset or otherwise participating in such bid, and the complete terms of any such participation."

134.    Pursuant to the Bidding Procedures approved on February 22, 2005, Borek owed a duty to fully disclose the identity of all persons participating in the 64 East/Borek Bid and the complete terms of their participation.

135.    Borek had knowledge that 64 East was a front for the Gianopoulos Brothers in the sale of Debtors' assets and of the agreement between the Gianopoulos Brothers and 64 East concerning the bid submitted by 64 East but did not disclose such facts to the Examiner, the Trustee or the Court.

136.    By concealing and intentionally failing to disclose the involvement and participation of the Gianopoulos Brothers in the 64 East/Borek Bid, and the agreement between 64 East/Borek and the Gianopoulos Brothers, Borek committed fraud.

137.    In reasonable reliance on the absence of any disclosure that 64 East was a front for the Gianopoulos Brothers and/or any disclosure concerning the involvement or potential involvement of the Gianopoulos Brothers in the 64 East/Borek Bid, the Trustee was deceived concerning the true facts and allowed the $2.1 million bid deposit that was tendered by 64 East at the behest of the Gianopoulos Brothers to be returned to counsel for 64 East.

138.   The Debtors have suffered damages as a direct result of the fraudulent concealment in that the $2.1 deposit would not have been returned to 64 East had Borek complied with his duty to disclose the identity of all persons participating in the 64 East/Borek Bid and the complete terms of their participation.  Rather, those funds would have been retained by the Trustee and made available to satisfy the allowed claims of creditors.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)   adjudge Borek liable for fraudulent concealment;

(b)   award damages in favor of the Trustee and against Borek, in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East which was returned to 64 East as a result of the fraudulent concealment alleged herein, and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)   award punitive damages against Borek to punish and deter others from the wrongful conduct alleged herein;

(d)   award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action; and,

(e)   grant such further relief the Court deems just.

## COUNT II – Fraudulent Concealment
(Against Rattet, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos)

139.   The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 138 as if fully set forth herein.

140.   From approximately June 1, 2004 through September 2, 2005, the Debtors operated as debtors in possession.

141.    As an officer, director, principal, managing member and/or person in control of a debtor in possession, the Gianopoulos Brothers were each officers of the Court and each owed a duty to voluntarily and honestly disclose all material facts concerning the Debtors' property as well as disclose any actual or potential arrangements or agreements with third parties concerning the purchase of Debtors' property.

142.    As counsel for the debtors in possession, Rattet and the other attorneys of the Rattet Law Firm performing services for the Debtors were officers of the court and owed a duty to voluntarily and honestly disclose all material facts concerning the Debtors' property as well as disclose any actual or potential arrangements or agreements with third parties concerning the purchase of Debtors' property.

143.    At all times relevant, Rattet and the other attorneys of the Rattet Law Firm were acting in the ordinary course of their duties as attorneys and partners in the Rattet Law Firm or with the authority of their copartners.

144.    Tom Gianopoulos, Gus Gianopoulos, and Rattet each had knowledge or notice that 64 East was a front for the Gianopoulos Brothers in the sale of the Debtors' assets and of the agreement between the Gianopoulos Brothers and 64 East concerning the bid submitted by 64 East but did not disclose such facts to the Court, the Trustee, or the Examiner.

145.    By concealing and intentionally failing to disclose the agreement and secret dealings between the Gianopoulos Brothers and 64 East and/or Borek, Tom Gianopoulos, Gus Gianopoulos, Rattet, and the Rattet Law Firm committed fraud.

146.    In reasonable reliance on the absence of any disclosure that 64 East was a front for the Gianopoulos Brothers and/or any disclosure concerning the involvement or potential involvement of the Gianopoulos Brothers in the 64 East/Borek Bid, the Trustee was deceived

concerning the true facts and allowed the $2.1 million bid deposit that was tendered by 64 East at the behest of the Gianopoulos Brothers to be returned to counsel for 64 East.

147.    The Debtors have suffered damages as a direct result of the fraudulent concealment in that the $2.1 deposit would not have been returned to 64 East had Tom Gianopoulos, Gus Gianopoulos, Rattet, and the Rattet Law Firm complied with their duties as officers of the Court and disclosed the agreement with 64 East concerning the purchase of Debtors' property.  Rather, those funds would have been retained by the Trustee and made available to satisfy the allowed claims of creditors.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)    adjudge Rattet, the Rattet Law Firm, Tom Gianopoulos, and Gus Gianopoulos liable for fraudulent concealment, jointly and severally;

(b)    award damages in favor of the Trustee and against Rattet, the Rattet Law Firm, Tom Gianopoulos, and Gus Gianopoulos, jointly and severally, in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East that was returned to 64 East as a result of the fraudulent concealment alleged herein; and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)    award punitive damages against Rattet, the Rattet Law Firm, Tom Gianopoulos, and Gus Gianopoulos to punish and deter others from the wrongful conduct alleged herein;

(d)    award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action; and

(e)    grant such further relief the Court deems just.

## COUNT III – Conspiracy to Commit Fraudulent Concealment

(Against Tom Gianopoulos, Gus Gianopoulos, Rattet, the Rattet Law Firm, Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, and Rothschild)

148.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 147 as if fully set forth herein.

149.    By concealing and intentionally failing to disclose the agreement between the Gianopoulos Brothers and 64 East and/or Borek whereby 64 East agreed to serve as a front for the Gianopoulos Brothers in connection with the sale of the Debtors' assets and thereby effect a fraudulent sale of the Debtors' assets to the Gianopoulos Brothers, Borek, Rattet, and the Rattet Law Firm committed fraudulent concealment.

150.    Tom Gianopoulos, Gus Gianopoulos, Anne Gianopoulos, Stacey Gianopoulos, Rattet, the Rattet Law Firm, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, and Rothschild agreed, expressly or impliedly, to keep secret and not disclose the agreement between the Gianopoulos Brothers and 64 East and/or Borek whereby 64 East agreed to serve as a front for the Gianopoulos Brothers in connection with the sale of the Debtors' assets.

151.    In furtherance of this agreement, 64 East served as a nominee for the Gianopoulos Brothers in connection with the auction of Debtors' assets; Borek and Stockel caused or authorized 64 East to submit a purportedly legitimate and independent offer for the purchase of the Debtors' assets, and caused or authorized Newell Funding to provide funding for the 64 East/Borek bid; Newell Funding funded a $2.6 million loan that financed the 64 East/Borek Bid; Tom Gianopoulos and Gus Gianopoulos met with Borek and procured a $2.6 million loan from Newell Funding and otherwise negotiated the terms of the 64 East/Borek Bid; Rothschild prepared various legal documents for the closing of the $2.6 million loan; the Gianopoulos Brothers, Anne Gianopoulos, Stacey Gianopoulos, and Nodine Realty allowed their names

29

and/or signatures to be used on the March 24, 2005 letter addressed to 64 East for purposes of facilitating the $2.6 million loan and the 64 East/Borek Bid; Pasternak drafted a rider to the Purchase and Sale Agreement that 64 East used for purposes of tendering its fraudulent bid to the Court; Rattet arranged a meeting at the Rattet Law Firm on March 16, 2005 with Borek, Tom Gianopoulos and Gus Gianopoulos to discuss the 64 East/Borek Bid, caused the offering memorandum for the sale of Debtors' assets to be delivered to Borek, and did not disclose to the Court the involvement of the Gianopouloses in the 64 East/Borek bid.

152.    The defendants acted intentionally for the purpose of furthering the fraud.

153.    The Debtors suffered injury as a direct and proximate result of the conspiracy.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)    adjudge Tom Gianopoulos, Gus Gianopoulos, Rattet, the Rattet Law Firm, Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, Rothschild, and the Rothschild Law Firm liable for fraudulent concealment, jointly and severally;

(b)    grant judgment in favor of the Trustee and against Tom Gianopoulos, Gus Gianopoulos, Rattet, the Rattet Law Firm, Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, Rothschild, and the Rothschild Law Firm jointly and severally, in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East that was returned to 64 East as a result of the fraudulent concealment alleged herein; and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)    award punitive damages against Tom Gianopoulos, Gus Gianopoulos, Rattet, the Rattet Law Firm, Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East,

Newell Funding, Borek, Stockel, and Rothschild to punish and deter others from the wrongful conduct alleged herein;

(d)    award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action; and

(e)    grant such further relief the Court deems just.

<strong><u>COUNT IV – Breach of Fiduciary Duty</u></strong><br>(Against Rattet, Pasternak, and the Rattet Law Firm)

154.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 – 153 as if fully set forth herein.

155.    Rattet and Pasternak are attorneys licensed to practice law in the State of New York.

156.    The Rattet Law Firm served as counsel for the debtors in possession during the period starting at least May 2004 and ending in September 2005 and, thereafter, as counsel to the Debtors.

157.    As counsel for the Debtors in possession, Rattet and the other attorneys of the Rattet Law Firm performing services for the Debtors, including Pasternak, were officers of the Court.

158.    At all times relevant, Rattet and Pasternak were acting in the ordinary course of their duties as attorneys and partners in the Rattet Law Firm or with the authority of their co-partners.

159.    As counsel for the Debtors in possession, Rattet and the other attorneys of the Rattet Law Firm performing services for the Debtors, including Pasternak, were fiduciaries of the Debtors and their estates and owed the Debtors and their creditors the fiduciary duties of loyalty and care.

160.     As counsel for a debtor in possession, Rattet and Pasternak owed a duty of candor to all interests represented.

161.     As counsel for a debtor in possession, Rattet and Pasternak owed a duty to represent and advance the best interests of the corporate entities and their creditors, and not the interests of the principals of the corporate entities or other third parties.

162.     As counsel for the Debtors in possession, Rattet and Pasternak owed a duty to advise the Debtors and their principals concerning their duties and obligations under the Bankruptcy Code and the orders entered by the Court, and to assist the Debtors and their principals in fulfilling their respective duties and obligations.

163.     Rattet and Pasternak breached their fiduciary duty in the following ways, among others:  (a)   failing to disclose the involvement or potential involvement of the Gianopoulos Brothers, their wives, and/or entities that they owned or controlled in the bidding for Debtors' assets; (b)   failing to diligently investigate matters concerning the involvement or potential involvement of the Gianopoulos Brothers, their wives, and/or entities that they owned or controlled in the bidding for Debtors' assets; (c)   failing to properly counsel and supervise the Debtors and/or the principals of the Debtors so as to ensure that they complied with their respective duties and obligations under the Bankruptcy Code and the orders entered by the Court; (d) failing to disclose Rattet's role as agent for Borek and/or 64 East; (e) failing to ensure that the bid submitted by 64 East was a "Qualified Bid" that included an executed Bidder Registration Form, financial information, and was "a good faith, bona fide, offer to purchase"; (f) failing to ensure that the bid submitted by 64 East complied with the terms of the Settlement Agreement and this Court's Order entered on February 22, 2005 adopting and implementing the Bidding Procedures;  (g) causing  or  allowing  the  Rattet  Law  Firm  to  represent  the  Debtors  while

simultaneously serving as attorney and/or agent for Borek and entities owned or controlled by

Borek; (h) failing to disclose connections with entities owned or controlled by the Gianopoulos

Brothers; and (i) failing to disclose connections with entities owned or controlled by Borek.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)     adjudge that Rattet, Pasternak, and the Rattet Law Firm breached their fiduciary duties owed to the Debtors and their creditors;

(b)     award damages in favor of the Trustee and against Rattet, Pasternak, and the Rattet Law Firm in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East that was returned to 64 East as a result of the failure to disclose the involvement of the Gianopoulos Brothers in the 64 East bid; and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)     order the disgorgement of all compensation paid to Rattet, Pasternak, or the Rattet Law Firm for services rendered to the Debtors, set aside the order authorizing the retention of the Rattet Law Firm as counsel for the Debtors, adjudge Rattet and Pasternak, and the Rattet Law Firm constructive trustees of all compensation paid to Rattet, Pasternak or the Rattet Law Firm for services rendered to the Debtors, and disallow any future claim for fees or other compensation that may be submitted by Rattet, Pasternak or the Rattet Law Firm for services rendered to the Debtors;

(d)     adjudge Defendants Newell Funding, Golden Age Mortgage, the Rothschild Law Firm, Stacey Gianopoulos, and Anne Gianopoulos constructive trustees of the proceeds of the $2.1 million bid deposit paid to these Defendants as a result of the breach of fiduciary duty alleged herein;

(e)     award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action;

(f)     award punitive damages against Rattet, Pasternak, and the Rattet Law Firm to punish and deter others from the wrongful conduct alleged herein; and

(g)     grant such further relief the Court deems just.

## COUNT V – Breach of Fiduciary Duty
### (Against Tom Gianopoulos and Gus Gianopoulos)

164.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 163 as if fully set forth herein.

165.    As an officer, director, principal, managing member and/or person in control of a debtor in possession, Tom Gianopoulos and Gus Gianopoulos were each officers of the court and each owed the Debtors and their creditors the fiduciary duties of loyalty and care.

166.    The duties owed by Tom Gianopoulos and Gus Gianopoulos included the duty to voluntarily and honestly disclose all material facts concerning the Debtors' assets as well as disclose any actual or potential arrangements or agreements with third parties concerning the purchase of Debtors' assets.

167.    Tom Gianopoulos and Gus Gianopoulos breached their fiduciary duty by, among other things, entering into a secret agreement with Borek and/or 64 East whereby 64 East served as a front for the Gianopoulos Brothers in connection with the sale of the Debtors' assets, failing to disclose the existence of this agreement or arrangement to the Court, the Examiner, or the Trustee, and obtaining the funds representing the 64 East/Borek bid's bidding deposit

168.    As a direct result of their failure to disclose their fraudulent agreement with Borek and/or 64 East, the $2.1 million deposit tendered by 64 East was returned to the Rothschild Law Firm and thereafter disbursed to Defendants Newell Funding, Golden Age Mortgage, the Rothschild Law Firm, Stacey Gianopoulos, and Anne Gianopoulos.

169.    The Debtors have suffered damages, including, but not limited to, the $2.1 million bid deposit that would have been retained by the Trustee and made available to satisfy the allowed claims of creditors.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)    adjudge that Tom Gianopoulos and Gus Gianopoulos breached their fiduciary duties owed to the Debtors and their creditors;

(b)    award damages in favor of the Trustee and against Tom Gianopoulos and Gus Gianopoulos in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East that was returned to 64 East as a result of the failure of Tom Gianopoulos and Gus Gianopoulos to disclose their involvement in the 64 East bid; and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)    adjudge Defendants Newell Funding, Golden Age Mortgage, the Rothschild Law Firm, Stacey Gianopoulos, and Anne Gianopoulos constructive trustees of the proceeds of the $2.1 million bid deposit paid to these Defendants as a result of the breach of fiduciary duty of Tom Gianopoulos and Gus Gianopoulos;

(d)    award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action;

(e)    award punitive damages against Tom Gianopoulos and Gus Gianopoulos to punish and deter others from the wrongful conduct alleged herein; and

(f)    grant such further relief the Court deems just.

### COUNT VI – Conspiracy to Breach of Fiduciary Duty
(Against Rattet, Pasternak, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos)

170.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 169 as if fully set forth herein.

171.    As an officer, director, principal, managing member and/or person in control of a debtor in possession, Tom Gianopoulos and Gus Gianopoulos were each officers of the court and each owed the Debtors and their creditors the fiduciary duties of loyalty and care.

172.    As counsel for the Debtors in possession, Rattet, Pasternak, and the Rattet Law Firm were fiduciaries of the Debtors and owed the Debtors and their creditors the fiduciary duties of loyalty and care.

173.    Rattet, Pasternak, Tom Gianopoulos, and Gus Gianopoulos agreed, expressly or impliedly, to keep secret and not disclose the agreement between the Gianopoulos Brothers and Borek and/or 64 East whereby 64 East agreed to serve as a front for the Gianopoulos Brothers in connection with the sale of the Debtors' assets and thereby effect a fraudulent sale of the Debtors' assets to the Gianopoulos Brothers.

174.    In furtherance of the fraudulent scheme to effect a sale of estate assets to the Debtors' principals, 64 East submitted a purportedly legitimate and independent offer for the purchase of the Debtors' assets; Tom Gianopoulos and Gus Gianopoulos met with Borek and procured a $2.6 million loan from Newell Funding; Rothschild prepared various legal documents for the closing of the $2.6 million loan; the Gianopoulos Brothers, Anne Gianopoulos, Stacey Gianopoulos, and Nodine Realty allowed their names and/or signatures to be used on the March 24, 2005 letter addressed to 64 East; Pasternak drafted a rider to the Purchase and Sale Agreement that 64 East used for purposes of tendering its fraudulent bid to the Court; Rattet arranged a meeting at the Rattet Law Firm on March 16, 2005 with Borek, Tom Gianopoulos and

Gus Gianopoulos to discuss the 64 East/Borek Bid; Rattet caused the offering memorandum for the sale of Debtors' assets to be delivered to Borek; and Rattet and Pasternak failed to disclose connections with entities owned or controlled by the Gianopoulos Brothers and Borek.

175. Rattet, Pasternak, Tom Gianopoulos and Gus Gianopoulos intentionally engaged in the aforementioned conduct and intentionally participated in the aforementioned combination and conspiracy in furtherance of the plan to allow a fraudulent sale of the Debtors' assets to the Gianopoulos Brothers to go forward.

176. The Debtors suffered injury as a direct and proximate result of the aforementioned conspiracy.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)    adjudge Rattet, Pasternak, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos liable for conspiracy to breach fiduciary duty;

(b)    award damages in favor of the Trustee and against Rattet, Pasternak, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos, jointly and severally, in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East which was returned to 64 East as a result of the failure of Tom Gianopoulos and Gus Gianopoulos to disclose their involvement in the 64 East bid, and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)    order the disgorgement of all compensation paid to Rattet, Pasternak, or the Rattet Law Firm for services rendered to the Debtors, set aside the order authorizing the retention of the Rattet Law Firm as counsel for the Debtors, adjudge Rattet and Pasternak, and the Rattet Law Firm constructive trustees of all compensation paid to Rattet, Pasternak or the Rattet Law Firm for services rendered to the Debtors, and

disallow any future claim for fees or other compensation that may be submitted by Rattet, Pasternak or the Rattet Law Firm for services rendered to the Debtors;

(d)    award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action;

(e)    award punitive damages against Rattet, Pasternak, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos to punish and deter others from the wrongful conduct alleged herein; and

(f)    grant such further relief the Court deems just.

### COUNT VII – Aiding and Abetting Breach of Fiduciary Duty
(Against Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty,
64 East, Newell Funding, Borek, Stockel, and Rothschild)

177.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 176 as if fully set forth herein.

178.    Rattet, Pasternak, the Rattet Law Firm, Tom Gianopoulos, and Gus Gianopoulos breached their fiduciary duty by failing to disclose the agreement between the Gianopoulos Brothers and Borek and/or 64 East whereby 64 East agreed to serve as a front for the Gianopoulos Brothers in connection with the sale of the Debtors' assets and thereby effect a fraudulent sale of the Debtors' assets to the Gianopoulos Brothers.

179.    Anne Gianopoulos and Stacey Gianopoulos knowingly induced or participated in the breach of fiduciary duty and substantially assisted the breach of fiduciary duty by, among other things, agreeing to mortgage their family residences as security for the $2.6 million loan from Newell Funding to Nodine Realty.

180.    Nodine Realty knowingly induced or participated in the breach of fiduciary duty and substantially assisted the breach of fiduciary duty by, among other things, agreeing to mortgage property located at 57 North Central Ave., Hartsdale, New York, as security for the

38

$2.6 million loan from Newell Funding to Nodine Realty, and agreeing to allow $2.1 million of the loan proceeds to be paid to 64 East for 64 East to utilize as a deposit for the purchase of the Debtors' assets.

181.    64 East knowingly induced or participated in the breach of fiduciary duty and substantially assisted the breach of fiduciary duty by, among other things, agreeing to serve as a "straw man" purchaser as a front for the Gianopoulos Brothers and submitting a bid at the behest of the Gianopoulos Brothers in connection with the auction of Debtors' assets.

182.    Newell Funding knowingly induced or participated in the breach of fiduciary duty and substantially assisted the breach of fiduciary duty by, among other things, agreeing to fund the $2.6 million loan to Nodine Realty.

183.    Borek and Stockel knowingly induced or participated in the breach of fiduciary duty and substantially assisted the breach of fiduciary duty by, among other things, causing and authorizing Newell Funding to fund the $2.6 million loan to Nodine Realty  that was used to finance the bid submitted by 64 East for the purchase of the Debtors' assets at the behest of the Gianopoulos Brothers, and causing and authorizing 64 East to serve as a "straw man" purchaser as a front for the Gianopoulos Brothers.

184.    Rothschild knowingly induced or participated in the breach of fiduciary duty and substantially assisted the breach of fiduciary duty by, among other things, drafting and/or reviewing and approving the March 24 letter documenting the $2.6 million loan from Newell Funding, causing an application for title insurance to be made with the Stewart Title Insurance Company for property located at 57 North Central Ave., Hartsdale, New York, and 25 Finch Road and 182 Finch Road, in North Salem, New York, for purposes of facilitating the $2.6

million mortgage loan to Nodine Realty, and preparing various legal documents for the closing

of the $2.6 million loan to Nodine Realty.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)   adjudge Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, and Rothschild liable for aiding and abetting breach fiduciary duty;

(b)   award damages in favor of the Trustee and against Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, Rothschild, and the Rothschild Law Firm, jointly and severally, in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East that was returned to 64 East as a result of the failure of Tom Gianopoulos and Gus Gianopoulos to disclose their involvement in the 64 East bid; and (ii) all professional fees incurred and paid by the Debtors, the Examiner, and the Trustee as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)   award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action;

(d)   award punitive damages against Anne Gianopoulos, Stacey Gianopoulos, Nodine Realty, 64 East, Newell Funding, Borek, Stockel, and Rothschild to punish and deter others from the wrongful conduct alleged herein; and

(e)   grant such further relief the Court deems just.

## COUNT VIII – Unjust Enrichment
(Against Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos)

185.   The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 - 184 as if fully set forth herein.

186.   In reasonable reliance on the absence of any disclosure that 64 East was a front for the Gianopoulos Brothers and/or any disclosure concerning the involvement or potential involvement of the Gianopoulos Brothers in the 64 East/Borek Bid, the Trustee was deceived concerning the true facts and allowed the $2.1 million bid deposit that was tendered by 64 East at the behest of the Gianopoulos Brothers to be returned to counsel for 64 East.

187.   The $2.1 million bid deposit was then deposited into the attorney trust account of the Rothschild Law Firm.  Thereafter, on or about January 5, 2006, Rothschild caused the $2.1 million bid deposit to be disbursed by signing checks drawn on the attorney trust account of the Rothschild Law Firm made payable to Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos.

188.   Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos benefited from these disbursements at the expense of the Debtors.

189.   It would be inequitable and unjust for Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos to retain these benefits.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)   adjudge that Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos have been unjustly enriched through the retention of the amounts disbursed from the attorney trust account of the Rothschild Law Firm;

(b)   grant judgment in favor of the Trustee and against Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos, and order disgorgement of the assets wrongfully retained by them;

(c)     impose a constructive trust on the assets wrongfully transferred and retained by Newell Funding, Golden Age Mortgage, Development Strategies, the Rothschild Law Firm, Stacey Gianopoulos and Anne Gianopoulos;

(d)     award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action; and,

(e)     grant such other and further relief the Court deems just.

### COUNT IX – Negligence
(Against Rattet, Pasternak, and the Rattet Law Firm)

190.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 – 189 as if fully set forth herein.

191.    As counsel for the Debtors in possession, Rattet and the other attorneys of the Rattet Law Firm performing services for the Debtors, including Pasternak, owed a duty to advise the Debtors and their principals concerning their obligations under the Bankruptcy Code, to assist the Debtors and their principals in complying with their obligations under the Bankruptcy Code, and to oversee and supervise the Debtors and their principals so as to ensure that Debtors and their principals complied with their obligations under the Bankruptcy Code.

192.    As debtors in possession, the Debtors and their principals were obliged not to cause or allow the post-petition transfer of assets unless those transfers were authorized by the Court or the Bankruptcy Code.

193.    The Debtors' principals caused or allowed approximately $1.3 million in post-petition transfers that were not authorized by the Court or the Bankruptcy Code.

194.    Rattet and Pasternak failed to exercise the care of an attorney with ordinary skill and knowledge and breached their duties by, among other things: (a) failing to properly advise the Debtors and/or their principals concerning their respective duties under the Bankruptcy Code and orders of the Court; (b) failing to properly assist the Debtors and/or their principals in

42

complying with their respective duties under the Bankruptcy Code and orders of the Court; (c) failing to exercise proper oversight and supervision of the Debtors and/or their principals relating to post-petition operations and transfers and orders of the Court; (d) failing to take action to restrain the Debtors and/or their principals from causing or allowing unauthorized post-petition transfers; and (e) failing to institute legal action against the Debtors' principals or take other steps to recover the unauthorized post-petition transfers.

195.    As a direct and proximate result of the breach of duty owed by Rattet and Pasternak, Debtors suffered injury.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)    adjudge that Rattet, Pasternak, and the Rattet Law Firm failed to exercise reasonable care to ensure that the Debtors and their principals complied with the duties and obligations of debtors in possession;

(b)    grant judgment in favor of the Trustee and against Rattet, Pasternak, and the Rattet Law Firm in the amount representing all improper and unauthorized post-petition transfers of the Debtors, as well as all fees and costs incurred by the estates in seeking to collect those unauthorized post-petition transfers;

(c)    award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action; and

(d)    grant such other and further relief the Court deems just.

### COUNT X – Fraud on the Court
(Against Borek, Stockel, Rattet, the Rattet Law Firm, Tom Gianopoulos,
Gus Gianopoulos, Anne Gianopoulos, Stacey Gianopoulos, and Rothschild)

196.    The Trustee incorporates and realleges the allegations set forth in Paragraphs 1 – 195 as if fully set forth herein.

197.    From approximately June 1, 2004 through September 2, 2005, the Debtors operated as Debtors in possession.

198.    As officers, directors, principals, managing members and/or persons in control of those Debtors in possession, the Gianopoulos Brothers each owed a duty to voluntarily and honestly disclose all material facts concerning the Debtors' estates, including any actual or potential arrangements or agreements concerning the purchase of Debtors' assets.

199.    As counsel for the Debtors in possession, Rattet, as well as other attorneys of the Rattet Law Firm performing services for the Debtors, including Pasternak, were officers of the court and owed a duty to voluntarily and honestly disclose all material facts concerning the Debtors' estates, including any actual or potential arrangements or agreements concerning the purchase of Debtors' assets.

200.    As set forth above, Rothschild, who is an attorney licensed to practice in the State of New York, had notice or knowledge of the arrangement whereby Borek, through 64 East, would serve as a front for the Gianopoulos Brothers in connection with the bid for the purchase of the Debtors' assets and, on information and belief, he intentionally failed to ensure that 64 East/Borek fully disclosed the identity of each person participating in the 64 East/Borek Bid.

201.    As set forth above, Borek, Stockel, Anne Gianopoulos, and Stacey Gianopoulos colluded and conspired with the Gianopoulos Brothers, Rattet, Pasternak, and the other attorneys of the Rattet Law Firm to perpetrate a fraud on this Court.

202.    Borek, Stockel, Rothschild, Anne Gianopoulos, Stacey Gianopoulos, the Gianopoulos Brothers, Rattet, and the other attorneys of the Rattet Law Firm each had knowledge or notice that 64 East was a front for the Gianopoulos Brothers but did not disclose such facts to the Court, the Trustee, or the Examiner.

203.    By concealing and intentionally failing to disclose the agreement and secret dealings between the Gianopoulos Brothers, 64 East, and Borek, the Gianopoulos Brothers, Anne

Gianopoulos, Stacey Gianopoulos, Borek, Stockel, Rothschild, Rattet, and the Rattet Law Firm misrepresented and otherwise failed to disclose certain material facts and thereby perpetrated a fraud on this Court.

204.    In reasonable reliance on the absence of any disclosure that 64 East was a front for the Gianopoulos Brothers and/or any disclosure concerning the involvement or potential involvement of the Gianopoulos Brothers in the 64 East/Borek Bid, the Trustee and this Court were deceived concerning the true facts.

205.    The Debtors have suffered damages as a direct result of the fraud on this Court, including, but not limited to, the $2.1 million deposit which would not have been returned to 64 East had Borek, Stockel, the Gianopoulos Brothers, Anne Gianopoulos, Stacey Gianopoulos, Rothschild, Rattet, and the other attorneys of the Rattet Law Firm not perpetrated a fraud on this Court.  Rather, the $2.1 million deposit would have been retained by the Trustee and made part of the Debtors' estates in order to satisfy the allowed claims of creditors.

206.    The misrepresentations and/or omissions of Borek, Stockel, the Gianopoulos Brothers, Stacey Gianopoulos, Anne Gianopoulos, Rothschild, Rattet, and other attorneys of the Rattet Law Firm defrauded this Court, negatively affected the judicially-approved sale process of the Debtors' assets, and thereby caused a grave miscarriage of justice.

207.    Borek, Stockel, Anne Gianopoulos, Stacey Gianopoulos, Rothschild, Rattet, Pasternak, the Rattet Law Firm, and the Gianopoulos Brothers have benefited from this fraud in that, but for their misrepresentations and non-disclosure, the 64 East/Borek Bid would never have been accepted nor would the 64 East Bid Deposit have been returned.

208.    As this fraud upon the Court was not discovered until mid-March of 2006, neither the Trustee nor the Examiner had the opportunity to discover the misrepresentations and

45

omissions and either bring it to this Court's attention or bring an appropriate corrective proceeding prior to the filing of this Complaint.

209.    Furthermore, prior to the filing of this Complaint, there was no opportunity to have this fraud upon the Court fully litigated in the original bankruptcy proceeding.

WHEREFORE, the Trustee respectfully requests that the Court:

(a)    adjudge Borek, Stockel, Rothschild, Anne Gianopoulos, Stacey Gianopoulos, Rattet, the Rattet Law Firm, Tom Gianopoulos, and Gus Gianopoulos liable for Fraud on the Court;

(b)    award disgorgement of fees and other damages in favor of the Trustee and against Borek, Stockel, Rothschild, Anne Gianopoulos, Stacey Gianopoulos, Rattet, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos in an amount not less than $2.1 million, plus interest, representing: (i) the amount of the bid deposit tendered by 64 East that was returned to 64 East as a result of the fraudulent concealment alleged herein; and (ii) all professional fees incurred by the Debtors, the Examiner, the Trustee, and their professionals as a result of the 64 East/Borek Bid and resulting investigation including, but not limited to, fees paid to Keen Consultants, LLC, FTI Consulting, the Rattet Law Firm, Wormser, Kiely, Galef & Jacobs LLP, the Examiner, Pullman & Comley, and Gardner Carton & Douglas LLP (now Drinker Biddle & Reath LLP);

(c)    impose punitive penalties against Borek, Stockel, Rothschild, Anne Gianopoulos, Stacey Gianopoulos, Rattet, the Rattet Law Firm, Tom Gianopoulos and Gus Gianopoulos to punish and deter others from the wrongful conduct alleged herein;

(d)    award the Trustee her reasonable attorneys' fees and costs incurred in bringing this action; and,

(e)    grant such further relief as equity requires and this Court deems just and necessary to correct the injustices resulting from the fraud on the Court.

Dated:  February 13, 2007
         Chicago, Illinois

Respectfully submitted,

DRINKER BIDDLE & REATH LLP


        /s/ Warren von Credo Baker

Warren von Credo Baker (WB 1100)
John J. D'Attomo (JD 9013)
David S. Almeida (DA 8341)
191 N. Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
(312) 569-1000

*Proposed Substitute Counsel for Janice B.
Grubin, Chapter 11 Trustee for Food
Management Group, LLC, KMA I, Inc., KMA II,
Inc., KMA III, Inc., and Bronx Donut Bakery, Inc.*