UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x    **FOR PUBLICATION**

In re                                                        :
                                                             :
FOOD MANAGEMENT GROUP, LLC,                                  :    Chapter 11
KMA I, Inc.,                                                 :    Case No. 04-22880 (ASH)
KMA II, Inc.,                                                :    Case No. 04-22890 (ASH)
KMA III, Inc.,                                               :    Case No. 04-22891 (ASH)
BRONX DONUT BAKERY, INC.                                     :    Case No. 04-22892 (ASH)
                                                             :    Case No. 04-04-20312 (ASH)
                              Debtor.                        :
                                                             :
------------------------------------------------------------x    (Jointly Administered)
                                                             :
JANICE GRUBIN, in her capacity as Chapter 11                 :    Adv. Proc. 07-08221 (MG)
Trustee for Debtors FOOD MANAGEMENT                          :
GROUP, LLC, KMA I, Inc., KMA II, Inc., and                   :
BRONX Donut BAKERY, INC.                                     :
                                                             :
                              Plaintiff,                     :
                - against -                                  :
                                                             :
ROBERT L. RATTET;                                            :
JONATHAN S. PASTERNAK; RATTET                                :
PASTERNAK & GORDON OLIVER, LLP                               :
                                                             :
                              Defendants                     :
------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**A P P E A R A N C E S :**

WHITE FLESHER & FINO, LLP
140 Broadway, 36th Floor
New York, New York 10005
By:    Gil M. Coogler, Esq.

DUANE MORRIS & HECKSCHER LLP
227 West Monroe Street – Suite 3400
Chicago, Illinois 60606
By:  John Collen, Esq.

*Co-Counsel for Robert L. Rattet, Jonathan S. Pasternak and Rattet, Pasternak & Gordon Oliver, LLP*

DRINKER BIDDLE & REATH LLP
191 N. Wacker Drive, Suite 3700
Chicago, Illinois 60606
By:    Warren von Credo Baker, Esq.

*Counsel for Janice B. Grubin, Chapter 11 Trustee for Food Management Group, LLC,
KMA I, Inc., KMA II, Inc., KMA III, Inc., and Bronx Donut Bakery, Inc.*

**MARTIN GLENN,**
**United States Bankruptcy Judge**

This case raises important issues concerning the integrity of the bankruptcy

process.  If the allegations in the adversary complaint filed by the chapter 11 trustee,

Janice B. Grubin ("Grubin" or "Trustee"), are proven, the former counsel for the debtors

engaged in serious wrongdoing.  Pending before the Court is a motion to dismiss

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, made

applicable to this adversary proceeding by Rules 7009 and 7012(b) of the Federal Rules

of Bankruptcy Procedure, filed by the law firm of Rattet, Pasternak & Gordon Oliver,

LLP ("Rattet"), and two of its named partners, Robert L. Rattet, Esq., and Jonathan S.

Pasternak, Esq. (together, the "Rattet Defendants").  The Rattet Defendants were among

sixteen defendants originally included in the adversary complaint ("Compl.," ECF Doc.

No. 1).[1]  For the reasons provided below, the motion to dismiss is granted in part and

denied in part.  The Trustee is granted leave to amend the complaint with respect to one

of the dismissed claims.

---

[1]    In addition to the Rattet Defendants, the adversary complaint originally named as defendants
Anastasios Gianopoulos, Constantine Gianopoulos, Anastasia (a/k/a Anne) Gianopoulos, Anastasia (a/k/a
Stacey) Gianopoulos, 64 East 126th Street LLC, Newell Funding LLC, Golden Age Mortgage Corp.,
Development Strategies Company, LLC, Thomas R. Borek, Robert J. Stockel, Alan H. Rothschild,
Rothchild & Pearl, LLP, and Nodine Realty Corporation.  All defendants other than the Rattet Defendants
previously settled the action.

# I.  **BACKGROUND**[2]

On June 1, 2004, the Debtor Food Management Group, LLC filed a voluntary

petition for reorganization pursuant to chapter 11 of the Bankruptcy Code.  On June 2,

2004, the Debtors KMA I, Inc., KMA II, Inc., KMA III, Inc. and Bronx Donut Bakery,

Inc. (collectively, where appropriate, the "Debtors" or "FMG") respectively filed

voluntary petitions for reorganization pursuant to chapter 11 of the Bankruptcy Code.

FMG engaged in the business of managing twenty four (24) Dunkin' Donuts franchises

that were owned and operated by the Debtors KMA I, Inc., KMA II, Inc. and KMA III,

Inc.  The Debtor Bronx Donut Bakery, Inc. was engaged in the business of operating a

cooperative food production facility, servicing the franchises owned by the KMA Debtors

and non-related Dunkin' Donuts franchises in the local area.  Rattet previously served as

counsel to the Debtors in the chapter 11 case from the initial filings in June 2004 until

September 2005, when Rattet was ordered by Grubin to have no further involvement in

the case.

Even before the chapter 11 case was filed, FMG was embroiled in several

lawsuits that threatened its continued existence.  FMG was owned by members of the

Gianopoulos family.  The Dunkin' Donuts franchisor, Dunkin' Donuts Incorporated

("Dunkin' Donuts"), sued the Gianopouloses in federal court in White Plains, New York

for failure to pay franchise fees.  That action was resolved by a settlement that

contemplated the sale of FMG's 24 Dunkin' Donuts franchises no later than July 31,

2005 (the "Settlement Agreement").  The Settlement Agreement required that the

Gianopouloses have no further direct or indirect involvement with Dunkin' Donuts

---

[2]      For the history surrounding FMG's bankruptcy and the efforts to sell the Debtors' assets, *see* the
Decision After Trial of Judge Hardin in *Food Management Group, LLC v. Matrix Realty Group, Inc. (In re
Food Management Group, LLC)*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007).

franchises.[3]

FMG was also a party to a lawsuit in federal court with QuesTech Financial, LLC ("QuesTech"). QuesTech was a secured lender to FMG and QuesTech claimed that FMG had converted the collateral securing its loans. On QuesTech's motion, Judge Colleen McMahon appointed a temporary receiver, *pendente lite*. FMG responded by filing its chapter 11 petition on June 1, 2004. On June 10, 2004, QuesTech moved for the appointment of a chapter 11 trustee. The motion was denied, but an Examiner was appointed to investigate the conduct of Debtors and their principals.

After the chapter 11 case was filed, Dunkin' Donuts sought to enforce the terms of the Settlement Agreement requiring the sale of FMG's franchises no later than July 31, 2005. Therefore, the effort to salvage substantial value from the Debtors' business required a sale without any continuing involvement by the Gianopouloses. Dunkin' Donuts had the contractual right to approve any purchaser before the sale could be completed.

On January 11, 2005, Rattet filed on behalf of the Debtors a motion for authorization to conduct an auction of substantially all of Debtors' property free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. §§ 105, 363(a) and (b) and 365 ("Auction Motion"). The Auction Motion also included Bidding Procedures and an Offer & Bidder Registration Form. On February 22, 2005, the Court granted the Auction Motion and entered an order authorizing the Bidding Procedures and sale process.

---

[3]    The Settlement Agreement provided as follows:

The Prospective transferee(s) must not be an immediate family member of any Franchisee who is a signatory to this Agreement or be associated in any way with the past or present management of any of the franchises; nor may any member of the Franchisees' families have any interest, directly or indirectly, in any of the Franchises following the transfer, except as an assignee of any notes or security agreements executed by a transferee. (Compl. ¶ 30; Compl. Exh. A.)

(Compl. ¶ 60.)  The Bidding Procedures provided that any offer be "a good faith, bona

fide, offer to purchase," and required that each bidder "fully disclose the identity of each

entity that will be bidding for a[n] Asset or otherwise participating in such bid, and the

complete terms of any such participation," and that each bidder submit a registration form

certifying that the bidder was not an insider of the Debtors.  (Compl. ¶¶ 61-64.)

The Bidding Procedures required a "Qualified Bidder" to submit an executed,

irrevocable contract, a completed Bidder Registration Form and a deposit of ten percent

(10%) of the bid amount to Rattet.  The Bidding Procedures also contemplated a

"stalking horse bid," intended to elicit higher bids, with a negotiated break-up fee in the

event the stalking horse bid was topped.

Between March 1, 2005 and March 16, 2005, the Trustee alleges that the Rattet

Defendants had discussions with the Gianopouloses concerning the sale of the Debtors'

assets, as evidenced by Rattet's time records and documents created by Rattet during this

time period.  (Compl. ¶¶ 69-72.)  At a March 16, 2005 meeting between Mr. Rattet,

Thomas Borek ("Borek"), and the Gianopouloses, Mr. Rattet purportedly told Borek that

he would have to disclose any connection that the Gianopouloses had with any bids for

Debtors' assets.  (Compl. ¶ 76.)  Borek is a principal of 64 East as well as of Newell

Funding and Golden Age Mortgage Corp., all of which were co-defendants in this

adversary proceeding.  (Compl. ¶ 15.)

ZPG Restaurant Associates, LLC ("ZPG"), and a related party, the Matrix Realty

Group, Inc. ("Matrix"), expressed an interest in purchasing all of the Debtors' assets for

$16,000,000, and to be designated as a "stalking horse" bidder.  ZPG/Matrix requested a

break-up fee of 2.5% of its bid in the event that it was not the ultimate successful

purchaser of the Debtors' assets.  On March 18, 2005, ZPG/Matrix executed (1) a contract of sale for the purchase of all of the Debtors' assets for $16,000,000 and (2) an Offer & Bidder Registration Form.  It also deposited $1,600,000 in escrow with Rattet. The Court scheduled a March 24, 2005 hearing on the amount of the ZPG/Matrix break-up fee.

On March 22, 2005, Mr. Rattet met with Borek at the Rattet firm offices to discuss a potential bid by 64 East and involvement by the Gianopouloses in any bid by 64 East.  (Compl. ¶ 79.)  Immediately after the meeting, Mr. Rattet drafted a letter that he personally handed to Borek, and that included the following language:

> With respect to your potential purchase of the above referenced Debtors' assets pursuant to 11 U.S.C. Sections 363 and 365, please find enclosed herewith the following:
>> (1) A copy of an agreement, dated October 2002, as amended, between Dunkin' Donuts Incorporated and its affiliates, and the Debtors.
>> (2) A copy of the Bidding Procedures and Auction Order. Please note that the Auction Order supersedes the printed Bidding Procedures, and to the extent the latter are inconsistent with the Order, the Order controls.
>
> Please pay particular attention to Paragraph "5" of the Settlement Agreement with respect to transfer of the franchises.  Because subparagraphs "E" and "F" of the Paragraph 5 require an "arms-length transaction" and that the transferee cannot be "associated in any ways [sic] with the past or present management," I strongly urge you to ensure that Tom and/or Gus have individual bankruptcy counsel in connection with any security provided to you or otherwise, and insist that they do so.

(Compl. ¶ 80 Ex. L.)

Mr. Rattet later testified in a Rule 2004 deposition that the March 22 letter was intended as a "warning" to Borek because of "an innuendo" of an improper arrangement between Borek and the Gianopouloses regarding the 64 East bid.  (Compl. ¶ 81.)  Rattet's concerns in the letter to Borek were not shared with any other persons (including Borek's

own counsel in the bankruptcy) nor did Rattet disclose this information to the Court. (Compl. ¶¶ 82-85.)

At the March 24, 2005 Court hearing, with the new higher bid in hand, Rattet asked the Court to approve 64 East's $21 million bid as the stalking horse bid (instead of the ZPG/Matrix $16 million bid), and also to approve a break-up fee for 64 East in the event its bid was topped. On March 31, 2005, the Court approved the 64 East bid, including a break-up fee of $250,000 for 64 East, and of $50,000 for ZPG/Matrix, in the event that either bidder was not the ultimate successful purchaser. (Case No. 04-22880, ECF Doc. No. 291.) The Court was *not* advised that 64 East failed to provide the required certification regarding the absence of involvement by the Gianopouloses. As it turned out, the Gianopouloses were very much involved in the 64 East bid.

Following the March 24, 2005 hearing, ZPG/Matrix withdrew its $16,000,000 offer, and its deposit of $1,600,000 was returned to it. On April 15, 2005, the last day of bidding, Matrix then made a new $26,770,000 offer that included cash of $24,000,000, and other consideration, conditioned on the Court cancelling the auction and permitting the Matrix transaction to proceed as a private sale. (Compl. ¶ 95; Case No. 04-22880, ECF Doc. No. 307, Emergency Motion to Cancel Auction, ¶¶ 13, 14.) Matrix submitted to Rattet a new executed sale contract and a $2,400,000 deposit check.

Dunkin' Donuts initially rejected Matrix as a purchaser on the grounds that the proposed operations manager was not "morally or ethically fit to operate a Dunkin' Donuts franchise," *Matrix*, 372 B.R. at 184, but on June 8, 2005, Dunkin' Donuts reversed its position and agreed to approve Matrix conditioned on Matrix hiring an appropriate operations manager. *Id.* at 185. After an evidentiary hearing on June 29,

2005, the Court found that the rejection of the originally proposed operations manager was reasonable. *Id.* at 186. "By letter dated June 10, 2005, Matrix unequivocally informed the debtors' counsel that Matrix would not close on the purchase contemplated by the Contract." *Id.* Matrix's repudiation of the contract was confirmed at the June 29, 2005 hearing. *Id.* at 187.

As a result of Matrix's refusal to proceed with the transaction, the Trustee has also sued Matrix in a case pending before Judge Hardin. Trial of that case was bifurcated, and in the first phase of the trial on issues of liability, Judge Hardin found that Matrix's repudiation of the contract was an anticipatory breach. Judge Hardin ruled that the "debtors are entitled to judgment against Matrix on the issue of liability for breach of the Matrix Contract." *Id.* at 211. Trial of the damages phase has not yet occurred, but Judge Hardin addressed issues of recoverable damages in a December 10, 2007 opinion that is also relevant to issues regarding the possible measure of damages in this case. *See Food Management Group, LLC v. Matrix Realty Group, Inc. (In re Food Management group, LLC)*, Ch. 11 Case No. 04-22880, Adv. No. 05-08636, slip op., 2007 WL 4352225 (Bankr. S.D.N.Y. December 10, 2007).

When the Matrix transaction failed, efforts were renewed to complete a transaction with 64 East, as the second highest bidder. Dunkin' Donuts was asked to approve 64 East as a purchaser of the Debtors' franchises, but in July 2005, Dunkin' Donuts refused to approve the proposed sale to 64 East based on an unsatisfactory background check of Borek. Rattet then sought unsuccessfully to negotiate a sale of assets to The Beekman Group ("TBG").

After Dunkin' Donuts rejected 64 East as a purchaser, the complaint alleges,

Rattet took steps in furtherance of Borek's interests to cancel the contract and have 64 East's $ 2.1 million deposit returned to it.  (Compl. ¶¶ 100-109.)  The complaint also alleges that on December 8, 2005, unaware that 64 East's $2.1 million deposit was funded by the Gianopouloses, the Trustee returned 64 East's deposit to its bankruptcy counsel.  (Compl. ¶ 110.)

On September 1, 2005, the Examiner's motion for appointment of a trustee was granted, and Grubin was appointed as the chapter 11 trustee pursuant to 11 U.S.C. § 1104.  (Case No. 04-22880, ECF Doc. No. 427.)  Immediately upon her appointment as Trustee, Grubin demanded turnover of Rattet's files on the Debtors' chapter 11 case, and instructed Rattet to have no further involvement in the case.  Thereafter, the Trustee also successfully negotiated a contract to sell the Debtors' assets to TBG for $18 million.

In early March 2006, the Court directed Grubin to investigate the *bona fides* of 64 East's bid.  On March 15, 2006, the Court made public a letter dated March 24, 2005, from the Gianopouloses to 64 East, reciting that "[w]e have requested that you act as the Purchaser" of FMG's assets.  It also stated that Borek's entity, Newell Funding LLC, loaned $2,600,000 to the Gianopouloses, who directed that $2,100,000 of the proceeds in turn be loaned to Borek's entity, 64 East, to utilize as its deposit supporting its $21 million bid.  The letter provided that the break-up fee that would be due in the event 64 East's bid was topped would be split, with 64 East keeping $50,000 and the balance being paid to entities controlled by the Gianopouloses.[4]

---

[4]     The letter further provided as follows:

"It is understood that in connection with the bankruptcy proceedings referenced in the Contract, should the Court, Trustee or any creditor of the Debtor, inquire of the relationship between us and/or Newell Funding LLC . . . , or the matters surrounding this transaction and our participation, that you will make true and complete disclosure,

9

By Order dated April 4, 2006, the Court authorized Grubin to conduct an

investigation pursuant to FED. R. BANKR. P. 2004 of the facts and circumstances relating

to the 64 East bid. (Case No. 04-22880, ECF Doc. No. 683.) Following that

investigation, Grubin prepared the adversary complaint to recover damages allegedly

suffered by Debtors as a result of the events surrounding the proposed auction of the

Debtors' assets.[5]

The adversary complaint asserts the following claims against the Rattet

Defendants: (1) fraudulent concealment, (2) conspiracy to commit fraudulent

concealment, (3) breach of fiduciary duty, (4) conspiracy to breach fiduciary duty, (5)

negligence, and (6) fraud on the court.

With respect to the Rattet Defendants, the charging allegations of the complaint

can be summarized as follows: Rattet was retained to represent the Debtors in the chapter

11 case. On June 4, 2004, as required by FED. R. BANKR. P. 2014(a), Rattet submitted

with its application to be appointed as counsel an affidavit of no adverse interest (ECF

Doc. No. 5).[6] The adversary complaint alleges that Rattet failed to disclose its prior

representation of Nodine Realty, an entity owned or controlled by the Gianopouloses, in

Nodine's November 2002 bankruptcy filing. After recounting the facts of the failed

---

including, the advancement of the deposit under the Contract and any other agreement
that we may in the future enter into that pertains to this matter." (Case No. 04-22880,
ECF Doc. No. 933 Ex. 4.)

[5]      Grubin provided a draft of the adversary complaint to Rattet. Unsuccessful discussions ensued
between Rattet and Grubin to resolve the matter without the filing of the complaint. Rattet then moved to
require Grubin to file the adversary complaint under seal pursuant to 11 U.S.C. § 107(b), alleging that the
complaint contained "scandalous or defamatory" matter. The Court denied the motion in a published
decision. *See In re Food Management Group*, 359 B.R. 543 (Bankr. S.D.N.Y. 2007).

[6]      FED. R. BANKR. P. 2014(a) provides, in pertinent part, that "[t]he application shall be
accompanied by a verified statement of the person to be employed setting forth the person's connections
with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United
States trustee, or any person employed in the office of the United States trustee."

auction, the complaint alleges that Rattet as well as other defendants had "notice or knowledge," but failed to disclose to the Court, that the Gianopouloses were involved in the 64 East bid, despite the prohibition of any involvement on their part.  The complaint also alleges that Rattet failed to inform the Court of Rattet's "connections" with Borek, dating back as early as 2001 and continuing during the Debtors' chapter 11 case, during which time Rattet provided legal services to Borek and various entities owned or controlled by him.  *See* FED. R. BANKR. P. 2014(a).[7]   Rattet also failed to disclose the absence of the Bidder Registration Form from 64 East, a failure that Rattet now describes as "an administrative oversight that was unintentional and inadvertent."  Sealing Motion ¶ 30, at 10 (Case No. 04-22880, ECF Doc. No. 933).  The Trustee contends that Rattet, as counsel for the Debtors, had a fiduciary duty to the Debtors and to the Court to disclose this information.[8]

---

[7]        In its decision denying the motion to seal the adversary complaint, the Court noted:

It appears that Borek was not a party in interest when the Debtors commenced the chapter 11 case.  Although Rule 2014(a) does not expressly require a supplement to a professional's initial disclosure, "§ 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise from their retention." *In re Granite Partners, L.P.,* 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (cases collected); *see Rome v. Braunstein,* 19 F.3d 54, 57-58 (1st Cir. 1994) ("[T]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment.").  Furthermore, § 328(c) of the Bankruptcy Code provides that for professionals to receive compensation they "must maintain their disinterestedness and refrain from representing or holding an interest adverse to the estate . . . ." *In re Caldor, Inc.-NY,* 193 B.R. 165,176 (Bankr. S.D.N.Y. 1996).  Therefore, a professional's continuing disclosure of conflicts under Rule 2014(a), although not explicit in the rule, is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain "conflict free." *In re Granite Partners,* 219 B.R. at 35.  Whether Rattet made timely and adequate disclosure of its "connections" with Borek is not presented by the Sealing Motion or decided by the Court.

*Food Management Group*, 359 B.R. at 552 n.5.

Whether Rattet made timely and adequate disclosure of its "connections" with Borek is one of the issues that remain to be decided in this case.

[8]        Rattet disputes that it owed any fiduciary duty to disclose the information.  As explained below, the Court concludes under the circumstances presented here Rattet had a duty to disclose to the Court all

## II. STANDARDS GOVERNING A MOTION TO DISMISS

In reviewing a motion to dismiss under Rule 12(b)(6), "a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial." *In re Bayou Group, LLC*, 362 B.R. 624, 632 (Bankr. S.D.N.Y. 2007). A court "must accept all factual allegations as true*, even if the allegations are doubtful in fact.*" *Buena Vista Home Entm't, Inc. v. Wachovia Bank* (*In re Musicland Holding Corp.*)*, 374 B.R. 113, 119 (Bankr. S.D.N.Y. 2007) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007), and *Bell Atl. Corp v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). However, "a plaintiff has an obligation to provide 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Twombly*, 127 S. Ct. at 1965 (further noting that "[f]actual allegations must be enough to raise a right to relief above the speculative level"). "Instead, the plaintiff must amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *In re Musicland Holding Corp.*, 374 B.R. at 119 (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)) (emphasis in original). A court "must construe any well-pleaded factual allegations in the complaint in favor of the plaintiff." *In re Bayou Group, LLC*, 362 B.R. at 632.

In resolving a Rule 12(b)(6) motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine . . . [including] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*, 127 S. Ct. at 2509 (citing 5B CHARLES ALAN WRIGHT &

---

information relating to the auction of FMG's assets, especially any involvement by the Gianopouloses with any bidder. *See* Section III.B.3.a, *infra* at 40, *et seq*.

ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004 and Supp.

2007)).  A court may even consider a document that has not been incorporated by

reference "where the complaint relies heavily upon its terms and effect, which renders the

document integral to the complaint." *In re Musicland Holding Corp.,* 374 B.R. at 119

(quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002)).  In this case,

the complaint attaches numerous exhibits relating to the facts described in the

Background section, including pleadings, and Rule 2004 deposition transcripts and court

hearing transcripts relating to the auction and its aftermath.

In any claim alleging fraud, Rule 9(b) requires that in "all averments of fraud or

mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

Malice, intent, knowledge, and other condition of mind of a person may be averred

generally." FED. R. CIV. P. 9(b); *see also In re Marketxt Holdings Corp.*, 361 B.R. 369,

385 (Bankr. S.D.N.Y. 2007) ("The pleadings must adequately specify the statements that

were allegedly false or misleading, provide particulars as to the alleged falsity of the

statements, and state the time and place the statements were made and identity of the

persons who made them.").

With these principles in mind, the Court will address the the Rattet Defendants'

motion to dismiss.

### III. DISCUSSION

#### A.  Standing

The Rattet Defendants challenge the Trustee's standing on several grounds.  Since

standing may be jurisdictional under Article III of the United States Constitution, *Valley*

*Forge Christian College v. Ams. United for Separation of Church and State,* 454 U.S.

464, 471-76 (1982), it is a threshold issue that must first be resolved before reaching the

merits of the motion to dismiss.  First, they assert that the Trustee lacks standing to bring

suit under Bankruptcy Code §§ 541(a)(1) and 544(a)(1), arguing that the Trustee may

only bring suit to recover property of the estate.  The Rattet Defendants argue that the

Trustee is suing to recover the 64 East bid deposit ($2.1 million) that, before being

returned to 64 East, was held in escrow by the Trustee, and as an escrow deposit, the

money remained the property of 64 East rather than becoming property of the Debtors'

estate.  Therefore, they argue the Trustee does not have standing to sue to recover this

money.  Second, the Rattet Defendants assert that the party injured by the alleged scheme

is Dunkin' Donuts and not the Debtors, and under the *in pari delicto* doctrine and the

*Wagoner* rule, the Trustee cannot exercise the rights of the Debtors' creditors.  Third,

they argue that the Trustee lacks standing because it had no legal right to retain 64 East's

bid deposit and sustained no damages resulting from the return of the deposit.  The court

will address each argument in turn.

### 1.  Trustee's Standing Under §§ 541 and 544 of the Bankruptcy Code

The Rattet Defendants' first challenge to the Trustee's standing under Bankruptcy

Code §§ 541 and 544 can be quickly rejected.  "Under the Bankruptcy Code the trustee

stands in the shoes of the bankrupt corporation and has standing to bring any suit that the

bankrupt corporation could have instituted" if it had not filed for bankruptcy protection.

*Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir. 1991)

(*"Wagoner"*) (citing 11 U.S.C. §§ 541, 542).  Property of the estate under § 541

"includes all kinds of property, including tangible or intangible property, causes of action

. . . and all other forms of property . . . ."  *Mitchell Excavators, Inc. by Mitchell v.*

*Mitchell,* 734 F.2d 129, 131 (2d Cir. 1984) (quoting H.R.REP. NO. 95-595, at 82 (1978),

*reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6323).

Section 541(a)(1) broadly defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held . . ."; and § 541(a)(7) provides for the inclusion of any interest in property that is acquired after the commencement of the case. 11 U.S.C. § 541. *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983) (noting that "§ 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. . . . Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced"). Causes of action that arise after the debtor files for bankruptcy generally become property of the debtor's estate. *In re Betty Owens Schools, Inc.*, No. 96 Civ. 3576, 1997 WL 188127, at *2 (S.D.N.Y. Apr. 17, 1997) (collecting cases) (noting that "[t]o become part of the bankruptcy estate, a cause of action must belong to the debtor itself, either in whole or in part, and cannot belong solely to the debtor's creditors or shareholders"). Congress intended § 541(a) to be broad in scope, *Whiting Pools*, 462 U.S. at 205, and § 541(b) lists the items that are specifically excluded from property of the estate. Due to the broad nature of subsection (a), anything not specifically excluded under subsection (b) should be included as property of the estate. 5 COLLIER ON BANKRUPTCY ¶ 541.01 (15th ed. rev. 2007).

The Rattet Defendants challenge the Trustee's standing to bring the complaint on the grounds that the 64 East bid deposit was never property of the estate and is therefore not recoverable by the Trustee. But the Trustee is not seeking to recover the bid deposit under Bankruptcy Code § 542, or under the Trustee's avoidance powers under Bankruptcy Code § 544. Rather, the Trustee asserts causes of action for fraudulent

concealment, conspiracy to commit fraudulent concealment, breach of fiduciary duty,

conspiracy to breach fiduciary duty, negligence and fraud on the court, arising from

alleged post-petition misconduct by the Rattet Defendants. These post-petition causes of

action to the extent they seek to recover damages to the Debtors' estate are property of

the estate under § 541. Whether the bid deposit was ever property of the estate is not

relevant to these causes of action. The Trustee contends that because of the wrongful

conduct by the defendants the $2.1 million bid deposit was forfeited, and the Trustee is

now entitled to recover the amount as damages. The Trustee also alleges that the Debtors

suffered compensable damages, including but not limited to the loss of the bid deposit.

Whether the Trustee was entitled to retain the deposit as damages, or can now recover the

amount of the deposit as part of her damages, are questions that will have to await further

developments in the litigation. Under certain circumstances forfeiture or recovery of the

amount of the bid deposit may be an available remedy. *See Matrix Realty Group, Inc.*,

2007 WL 4352225, at *5 ("[A]n aggrieved seller of real estate [is allowed] to retain a ten

percent deposit where the actual damages, as measured by the difference between the

contract price and the eventual sales price, are substantially *less* than the deposit. Courts

have even held that the deposit can be retained where the eventual sales price is greater

than the breached contract price.") (emphasis in original). What is clear is that §§ 541

and 544 do not deny the Trustee standing to bring these claims.

### 2. In Pari Delicto and the Wagoner Rule

Next, the Rattet Defendants challenge the Trustee's standing under the *in pari*

*delicto* doctrine and the *Wagoner* rule on the grounds that the true victim of any alleged

misconduct was Dunkin' Donuts, rather than the Debtors or the estate, and therefore the

Trustee has no standing to sue a third party on behalf of the estate's creditors. As

explained below, the *in pari delicto* doctrine is a state law affirmative equitable defense

to the merits of the claims. Strictly speaking, *in pari delicto* does not raise a standing

issue. Federal courts have nevertheless developed a closely-related standing rule,

denying a plaintiff standing to bring certain claims in federal court in cases where the

factors giving rise to the application of the *in pari delicto* defense are present. Because

the *in pari delicto* equitable defense and the *Wagoner* standing rule are so closely related,

both will be dealt with in this section of the opinion.

    The complaint is clear that the Trustee is only seeking to recover damages to the

estate, distinct from any damages suffered by Dunkin' Donuts. The Court concludes

below that the *in pari delicto* doctrine and the *Wagoner* rule do not apply to bar the

Trustee's claims against the Rattet Defendants for the post-petition misconduct alleged in

this case. The Trustee has standing and may pursue the estate's causes of action against

the Rattet Defendants for damages to the Debtors' estate. The *in pari delicto* doctrine is

not a defense to the claims asserted in the complaint.

    Upon the commencement of a bankruptcy case, the trustee succeeds to a debtor's

rights, including the ability to sue and be sued. 11 U.S.C. § 323. However, it is well

settled that a bankruptcy trustee generally does not have standing to sue third parties on

behalf of the estate's creditors, and may only assert claims held by the bankrupt

corporation. *Wagoner,* 944 F.2d at 118 (citing *Caplin v. Marine Midland Grace Trust

Co.,* 406 U.S. 416, 434 (1972)); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette

Securities Corp.*, 351 F. Supp.2d 79, 88-90 (S.D.N.Y. 2004) (Lynch, J.); *Am. Tissue, Inc.

v. Arthur Andersen, L.L.P.*, 275 F. Supp.2d 398, 404 (S.D.N.Y. 2003) (Scheindlin, J.).

The *in pari delicto* doctrine and a party's standing to sue under *Wagoner*

represent separate and distinct legal principles that may bar an estate representative's

recovery from a third party malfeasor where the debtor is also at fault.  *In re Grumman*

*Olson Industries, Inc.*, 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y. 2005); John T. Gregg,

*The Doctrine of In Pari Delicto: Recent Developments*, NORTON ANN. SURV. OF BANKR.

LAW, PART I § 5, Sept. 2006, at 1 (*in pari delicto* "is generally treated as an equitable

defense under applicable state law").   *In pari delicto* is a state law equitable defense

analogous to unclean hands "rooted in the common-law notion that a plaintiff's recovery

may be barred by his own wrongful conduct."  *Pinter v. Dahl,* 486 U.S. 622, 632 (1988).

It is based on the idea that "where parties are equally at fault, the defending party is in the

stronger position."  *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir. 1990).  "It is not enough

that both parties are at fault, or *in delicto* ─ they must be equally at fault, or *in pari*

*delicto.*"  *Grumman Olson*, 329 B.R. at 424 n.5 (citing *Official Comm. of Unsecured*

*Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 163 (2d Cir.

2003)).  In other words, *in pari delicto* "refers to the plaintiff's participation in the same

wrongdoing as the defendant."  Gregg, *The Doctrine of In Pari Delicto: Recent*

*Developments*, at 3 (quoting *Turleky v. Hurd (In re Dublin Securities, Inc.*), 133 F.3d

377, 380 (6th Cir. 1997)).

Here the Trustee is not suing based on a cause of action that belonged to the

Debtors at the time the estate was created when the chapter 11 petitions were filed.  A

trustee acquires prepetition claims as property of the estate under Bankruptcy Code §

541(a)(1) subject to whatever infirmities (such as an *in pari* delicto defense) that may

have existed.  The claims asserted here are property of the estate under § 541(a)(7) – an

"interest in property that the estate acquires after the commencement of the case" – and it
is the post-petition conduct of the Debtors' principals, attorneys and other third-parties
that gave rise to the claims.  The Rattet Defendants − the Debtors' former attorneys −
seek to absolve themselves from liability for injury to the estate arising from their own
alleged misconduct by imputing the Gianopouloses' wrongdoing to the estate.  This they
cannot do.

Whether the state law doctrine of *in pari delicto* applies depends on whether the
bad actor's conduct can be imputed to the debtor and hence to the estate representative.
Gregg, *The Doctrine of In Pari Delicto: Recent Developments*, at 3 (citing *Official
Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 355 (3d Cir.
2001)).  If wrongdoing is imputed to the debtor, the *in pari delicto* doctrine applies and
bars the suit.  *Id.*  The doctrine is based on the premises that (i) courts should not mediate
disputes between wrongdoers, and (ii) denying judicial relief to wrongdoers deters illegal
conduct.  *Id.*  A chapter 11 trustee as the representative of the estate is in no sense a
wrongdoer (imputed or otherwise) when fraud is committed by the debtor's principals in
connection with a Bankruptcy Code § 363 sale of estate assets that requires court
approval.  Whatever the Gianopouloses' positions may have been with the Debtors at the
time of the proposed § 363 sale of estate assets, they lacked the authority to engage in the
sale of estate assets.  In these circumstances, the agency principles that underlie the *in
pari delicto* doctrine and the *Wagoner* rule do not require the imputation of the
Gianopouloses' conduct to the Trustee.

The *Wagoner* rule as applied in the Second Circuit is a federal rule of standing
that was developed in *Wagoner*, 944 F.2d 114.  *See Grumman Olson,* 329 B.R. at 425 n.4

("The *Wagoner* Rule is one of standing."). "Under the Bankruptcy Code, the bankruptcy

trustee may bring claims founded, *inter alia,* on the rights of the debtor and on certain

rights of the debtor's creditors." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093

(2d Cir. 1995) (citing 11 U.S.C. §§ 541, 544, 547). "Whether the rights belong to the

debtor or the individual creditors is a question of state law." *Id.* (quoting *St. Paul Fire &

Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700 (2d Cir. 1989)). Therefore, under the

Bankruptcy Code "the trustee stands in the shoes of the bankrupt corporation and has

standing to bring any suit that the bankrupt corporation could have instituted had it not

petitioned for bankruptcy." *Wagoner,* 944 F.2d at 118 (citing 11 U.S.C. §§ 541, 542).[9]

In *Wagoner* the bankruptcy trustee brought an action against the debtor's brokers

for aiding and abetting the debtor's sole shareholder in defrauding the debtor's

noteholders. All allegedly fraudulent conduct occurred pre-petition. The broker

challenged the trustee's standing on the grounds that the cause of action the trustee was

asserting on behalf of the estate belonged to the noteholders, and any action by the debtor

against the broker was barred by virtue of the fact that the debtor's sole shareholder and

---

[9]        The *Wagoner* standing rule has frequently been criticized and is not uniformly applied in all
circuits. *See In re Senior Cottages of Am., LLC,* 482 F.3d 997, 1004 (8th Cir. 2007) ("We agree with the
First, Third, Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure
the corporation does not deprive the corporation of standing to sue the third parties, though it may well give
rise to a defense that will be fatal to the action."); *Baena v. KPMG, LLP,* 453 F.3d 1, 6-10 (1st Cir. 2006)
(holding that the trustee's case was barred by the doctrine of *in pari delicto,* but stating that the doctrine
"has nothing to do with Article III requirements"); *Terlecky v. Hurd (In re Dublin Sec., Inc.),* 133 F.3d 377,
379-80 (6th Cir. 1997) (declining to consider the *in pari delicto* defense as a question of standing); *Schertz-
Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281,
1286 (5th Cir. 1994) ("That the defendant may have a valid defense on the merits of a claim brought by the
debtor goes to the resolution of the claim, and not to the ability of the debtor to assert the claim."). *See
also, e.g.,* Jeffrey Davis, *Ending the Nonsense: The In Pari Delicto Doctrine Has Nothing to Do With What
Is §541 Property of the Bankruptcy Estate,* 21 EMORY BANKR. DEV. J. 519 (2005); Tanvir Alam,
*Fraudulent Advisors Exploit Confusion in the Bankruptcy Code: How In Pari Delicto Has Been Perverted
to Prevent Recovery for Innocent Creditors,* 77 AM. BANKR. L.J. 305 (2003). *Wagoner* and its progeny are
the law of this Circuit and must be followed by this Court in circumstances in which the rule properly
applies. As explained in the text, however, the Second Circuit has never applied the *Wagoner* rule to post-
petition misconduct by principals or representatives of a debtor in possession that caused damages to the
estate, as allegedly occurred in this case.

officer was the principal that engaged in the looting. In considering whether the trustee had standing to sue the debtor's broker, the trustee cited several decisions which the court held stood for the proposition that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Wagoner,* 944 F.2d at 118. However, the Second Circuit noted this did not end the inquiry because the court needed to consider whether there was any damage to the corporation, apart from that done to the third-party noteholders. *Id.* at 119 (holding that the trustee has standing to bring a claim for churning the debtor's accounts because such a claim may form a basis for causes of action in fraud as well as breach of contract). With respect to the claim that the broker aided and abetted the debtor and unduly influenced it to make bad trades which dissipated corporate funds, the Second Circuit held that the trustee lacked standing to assert a claim against the broker because "[a] claim against a third party for defrauding a corporation with the cooperation of the management accrues to the creditors, not to the guilty corporation." *Id.* at 120.

The rationale for the *Wagoner* rule "derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir. 2000). "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Grumman Olson*, 329 B.R. at 423-24 (quoting *Wight,* 219 F.3d at 87); *Am. Tissue*, 351 F. Supp.2d at 88; *Am. Tissue*, 275 F. Supp.2d at 404. Where a Creditors Committee sues in place of the trustee as the estate's representative, it too is subject to the same limitation on standing.

21

*See Color Tile*, 322 F.3d at 156; *In re Mediators, Inc.*, 105 F.3d 822, 825-26 (2d Cir. 1997).

Here, the post-petition acts of the Debtors' principals are not properly imputed to the Trustee so as to bar the assertion of her claims for damages suffered by the estate. Since the Gianopouloses lacked authority to sell estate assets outside the ordinary course of business, the "fundamental principle of agency that the misconduct of managers *within the scope of their employment* will normally be imputed to the corporation," *Wight*, 219 F.3d at 86 (emphasis added), does not apply to bar the Trustee from suing for damages to the estate.[10]

The *in pari delicto* doctrine and the *Wagoner* rule are subject to various exceptions, and exceptions to the exceptions, making application of these principles difficult to apply in particular circumstances. An analysis of the exceptions further supports the conclusion that the Trustee is not barred from asserting her claims against the Rattet Defendants.

---

[10]     This case does not require the Court to decide whether the *in pari delicto* doctrine or the *Wagoner* rule may apply to bar estate claims (or standing) based on post-petition misconduct by a debtor's principals in the ordinary course of the debtor's business. On the one hand, agency principles may apply to bar state law claims against third parties where the misconduct of managers was within the scope of their employment and was therefore imputed to the debtor – *in pari delicto* is a state law equitable defense to state law claims. Of course, the adverse interest exception would still need to be evaluated. On the other hand, a strong federal policy concerning the integrity of bankruptcy proceedings supports finding standing to recover for post-petition misconduct by the debtor's agents or attorneys even if insiders were culpable. A trustee clearly has standing to sue the debtor's insiders for breach of fiduciary duty. *Mediators*, 105 F.3d at 826-27 ("We agree that a bankruptcy trustee, suing on behalf of a debtor under New York law, may pursue an action for breach of fiduciary duty against the debtor's fiduciaries."); *In re Granite Partners, L.P.*, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996) ("*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners. Otherwise, a trustee could never sue the debtor's insiders on account of their own wrongdoing. As we have stated, only the trustee has standing to sue insiders . . . for injuries to a corporation or a limited partnership arising from their waste, mismanagement or breach of fiduciary duty."). Certainly, standing would exist to enforce the statutory rights granted a trustee under the Bankruptcy Code, such as maintaining avoidance or turnover actions. *In re Hampton Hotel Investors, L.P.*, 289 B.R. 563, 581 (Bankr. S.D.N.Y. 2003) ("Thus the Trustee has the standing, under federal law, to assert, for the benefit of the estate, claims to recover counsel fees that had been unlawfully paid. It would be turning the *Wagoner* Rule and concepts of *in pari delicto* on their heads to hold that the Trustee lacks standing to recover such payments.")

### a. Adverse Interest Exception & Sole Actor Rule

The adverse interest exception is a recognized exception to the *in pari delicto*

doctrine. "Under New York law, the adverse interest exception rebuts the usual

presumption that the acts and knowledge of an agent acting within the scope of

employment are imputed to the principal." *Mediators,* 105 F.3d at 827 (citing *Center v.*

*Hampton Affiliates,* 66 N.Y.2d 782, 784 (1985)). "Under the exception, management

misconduct will not be imputed to the corporation if the officer acted entirely in his own

interests and adversely to the interests of the corporation." *Wight*, 219 F.3d at 87. The

theory is that "where an agent, though ostensibly acting in the business of the principal, is

really committing a fraud for his own benefit, he is acting outside of the scope of his

agency, and it would therefore be most unjust to charge the principal with knowledge of

it." *Id.* (quoting *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir. 1936)). The adverse

interest exception is intended to be narrow and only applies when the agent has "totally

abandoned" the principal's interests. *Mediators*, 105 F.3d at 827. The exception does

not apply simply because the agent has a conflict of interest or does not act primarily for

his principal. *Grumman Olson,* 329 B.R. at 425.

The adverse interest exception is not applied if this exception is subject to the

"sole actor" rule. The sole actor rule, generally treated as an exception to the adverse

interest exception, renders the adverse interest exception inapplicable where the

wrongdoing agent is the corporation's sole shareholder, *Mediators,* 105 F.3d at 827, or

where all of the corporation's management participates in the wrongdoing. *In re CBI*

*Holding Co., Inc.,* 311 B.R. 350, 373 (S.D.N.Y. 2004); *see Mediators,* 105 F.3d at 827

(the sole actor exception cancels out the adverse interest exception where the principal

and agent are one and the same). Under the sole actor rule, "the agent's knowledge is imputed to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." *Grumman Olson,* 329 B.R. at 425 (quoting *Mediators,* 105 F.3d at 827) (holding that the adverse interest exception did not apply because the wrongful actor was the corporation's sole shareholder and sole decision maker, and therefore whatever decisions he made were authorized by and made on behalf of the corporation). Even if the wrongdoer is not a "sole actor," the adverse interest exception remains inapplicable unless there is at least one "innocent" decision maker among management or the shareholders who could have stopped the fraud. *Grumman Olson,* 329 B.R. at 425 (holding that the committee lacked standing to sue prospective purchaser of debtor's assets for aiding and abetting because the adverse interest exception was inapplicable, as it was the board's goal to sell the company, the corrupt CEO was left in sole charge of the debtor, and there was no "innocent insider" who could have stopped the CEO's misconduct) (citing *In re Bennett Funding,* 336 F.3d 94, 100 (2d Cir. 2003) (assuming the existence of the "innocent insider" exception without adopting it); *CBI Holding,* 311 B.R. at 372-73 (rejecting the "innocent insider" exception but discussing its relationship to the *Wagoner* rule and the "sole actor" exception); *Wechsler,* 212 B.R. at 36 (dismissing the trustee's complaint for lack of standing based on the failure to allege the existence of an innocent member of debtor's management who could have been able to prevent the fraud had he known about it)). In the context of a Bankruptcy Code § 363(b)(1) sale, court approval of the sale is required. Therefore, the sole actor rule cannot apply. On the allegations in the

complaint, the Court was an innocent decision maker that was deceived by the

withholding of facts surrounding the allegedly collusive auction bid.

### b.  Whether the *Wagoner* Rule Applies to Post-petition Misconduct

The *Wagoner* rule is almost universally applied in the Second Circuit to bar

claims by a trustee due to pre-petition misconduct of the debtor.  *See, e.g., Bennett

Funding,* 336 F.3d 94 (applying *Wagoner* rule to fraud that occurred pre-petition, and

holding that the defrauded investors, and not the bankruptcy trustee, were entitled to

pursue the claims arising from fraud); *Wagoner,* 944 F.2d 114 (applying the rule where

the debtor's sole officer looted the corporation pre-petition); *CBI Holding Co.,* 311 B.R.

350 (discussing the *Wagoner* rule in light of accounting firm's failure, pre-petition, to

conduct its audit of the debtors in accordance with the generally accepted auditing

standards).  However, no Second Circuit case addresses the application of the *Wagoner*

rule or the *in pari delicto* doctrine to post-petition conduct by representatives of the

debtor.  Several cases from courts in other circuits, as well as a bankruptcy decision from

this district, either hold or suggest that the *Wagoner* rule does not bar a trustee from

bringing suit for post-petition misconduct by the debtor's principals or representatives.

In *In re Sukamto SIA*, 349 B.R. 640 (Bankr. Haw. 2006), a chapter 7 trustee (who

was also the chapter 11 trustee before the case was converted) brought an adversary

proceeding against UBS for assisting the debtor in money laundering and in concealing

and misappropriating property from creditors and the bankruptcy estate.  The court held

that the trustee's conspiracy claim against UBS could proceed based on post-petition

misconduct alleging that UBS assisted the debtor in laundering money while the

automatic stay and an injunction was in place.  In discussing the trustee's standing to sue

for civil conspiracy, the court noted that the trustee's standing depended on timing.  349
B.R. at 655 ("The timing question is whether the activities of the conspirators occurred
pre-bankruptcy or after [the debtor] filed his petition.").  The court further explained that
since the debtor was one of the alleged co-conspirators, the doctrine of *in pari delicto*
would prevent pre-bankruptcy claims against the debtor and his co-conspirators from
flowing to the estate, and would only belong to individual creditors.  *Id.*  However, the
question of the trustee's standing to sue for post-petition misconduct was different.  The
court held that, "[a]s to post-petition activities of the debtor and co-conspirators, the
result is different.  The trustee has standing to sue, because the injury is to the bankruptcy
estate.  The property of a chapter 7 bankruptcy estate belongs to the trustee, not to the
debtor.  If the trustee's conspiracy claims are based upon post-petition activities of the
conspirators, it does not matter whether or not the debtor is one of the conspirators.  The
debtor's post-petition unclean hands do not impair the ability of the trustee in bankruptcy
to pursue the debtor and debtor's co-conspirators."  *Id.* at 655 (further noting that as to
post-petition claims, the trustee has standing to sue on behalf of the estate pursuant to
Bankruptcy Code § 323 and Bankruptcy Rule 6009).

In *In re R&R Associates of Hampton*, 402 F.3d 257 (1st Cir. 2005), the court held
that post-petition legal malpractice and breach of fiduciary duty claims against the
debtor's lawyers, while debtor acted as debtor in possession in a chapter 11
reorganization and failed to disclose certain assets to the court, were property of the
estate, thereby giving the chapter 7 trustee standing to sue.  *Id.* at 264-65.  The court
further held that the claims belonged to the bankruptcy estate, and that the trustee, as
successor to the debtor in possession, was plainly entitled to pursue whatever claims

belonged to the estate. *Id.* at 265. While specifically ruling that the trustee had standing to sue based on post-petition conduct by the debtor, the court did not otherwise discuss *in pari delicto* or the *Wagoner* rule, even though the diversion of funds by the debtor was done to avoid disclosure in bankruptcy.

In *In re Hampton Hotel Investors, L.P.,* 289 B.R. 563, Judge Gerber applied the *Wagoner* rule to allegations in an adversary complaint brought by a chapter 7 trustee against the debtor as well as the debtor's affiliates and law firm. The trustee alleged causes of action for breaches of fiduciary duty, malpractice, and negligence arising from pre-petition conduct, as well as a cause of action for unauthorized post-petition payments from the debtor's estate. The law firm moved to dismiss, arguing, in part, that the trustee lacked standing under the *Wagoner* rule because of the debtor's own misconduct. While finding other pleading deficiencies requiring dismissal of four of the five causes of action, Judge Gerber also stated that *Wagoner* did not apply to bar the trustee from suing based on post-petition misconduct by the debtor and the law firm. He also concluded that factual issues remained regarding the application of the adverse interest exception to the *Wagoner* rule to the other four causes of action. *Id.* at 568. Regarding the trustee's standing to sue for post-petition unauthorized transfers, the court concluded that Bankruptcy Code § 549 explicitly granted the trustee power to avoid unauthorized transfers of property after the commencement of the bankruptcy case. *Id.* at 580.

The Rattet Defendants did not cite any authority that a bankruptcy trustee is barred by *in pari delicto* or the *Wagoner* rule from recovering damages against third

parties arising from post-petition misconduct. The Court's extensive research likewise failed to uncover any authority supporting that result.[11]

### c. Application of Wagoner and In Pari Delicto to this Case

The Rattet Defendants argue that under the *Wagoner* rule, the Trustee lacks standing to bring causes of action against Rattet because the Gianopouloses were involved in the fraudulent misconduct, and therefore the Debtor's misconduct is imputed to the Trustee. They further assert that the adverse interest exception to *Wagoner* would not apply, because Debtors were entities owned by one shareholder or interest holder, thereby giving rise to the sole actor exception to the adverse interest exception. In response, the Trustee argues that the *Wagoner* rule is inapplicable because it only applies to pre-petition misconduct. Furthermore, even if *Wagoner* is applied to post-petition misconduct, the Trustee argues that the adverse interest exception to the *Wagoner* rule would apply because the Gianopouloses were acting solely in their own self-interests, and in interests adverse to the estate, when 64 East submitted the allegedly collusive 64 East bid. The Trustee argues the Court's involvement in approving any post-petition sale means that the sole actor exception to the adverse interest exception would not apply.

For the reasons already explained, the court agrees with the Trustee that the *in pari delicto* doctrine and the *Wagoner* rule do not apply in this case because the post-petition acts of the Gianopouloses are not properly imputed to the Trustee. *See supra* at 21-22. The Court's Consent Order submitted by the Rattet Defendants was entered on February 22, 2005 and authorized the auction of the estate's assets. The Consent Order

---

[11]    An argument can be made that the trustee of a "solvent" debtor should not be permitted to recover damages that will result in any distribution to a debtor's principals who were involved in the wrongdoing. The Debtors in this case are insolvent, and if by some chance the *Matrix* and *Rattet* cases should result in recoveries enabling all creditors to be repaid in full, other legal principles could no doubt be applied to avoid an inequitable result.

included a clause prohibiting any bid submitted by a family member or relative of

Constantine Gianopoulos.  In March 2005, 64 East prepared a bid allegedly in collusion

with the Gianopouloses.  At the Court hearing on March 24, 2005, Rattet asked the Court

to approve 64 East's $21 million bid as the stalking horse bid, and to approve a break-up

fee for 64 East in the event its bid was topped.  On March 31, 2005, the Court approved

the 64 East bid, including a break-up fee of $250,000 for 64 East, and of $50,000 for

ZPG/Matrix, in the event that either bidder was not the ultimate successful purchaser.

The Court was *not* advised that 64 East failed to provide the required certification

regarding the absence of involvement by the Gianopouloses, or that the $250,000 break-

up fee to 64 East was to be split with $200,000 to the Gianopouloses and $50,000 to 64

East.

The complaint also alleges that after ZPG/Matrix submitted a higher bid that was

approved by the Court, Rattet then proceeded, at the expense of the Debtors' estates, with

efforts to have Dunkin' Donuts formally reject the 64 East bid and to have the 64 East bid

deposit returned, all while failing to disclose to the Court and to the Trustee that the 64

East bid was funded by the Gianopouloses.  (Compl. ¶¶ 103-04, 110, 112-13.)

The Rattet Defendants further argue that the $2.1 million deposit amount that the

Trustee seeks to recover cannot reflect the actual damages suffered by the Trustee.  The

Trustee argues, on the other hand, that as a result of defendants' wrongful conduct, the

bid deposit was forfeited and is recoverable as damages.  If the bid deposit was forfeited,

the loss of this amount is plainly damages to the estate.  Judge Hardin's recent opinion in

the *Matrix* case provides support for recovery of the bid deposit.  *Matrix Realty Group,

Inc.*, 2007 WL 4352225, at *5 ("[A]n aggrieved seller of real estate [is allowed] to retain

a ten percent deposit where the actual damages, as measured by the difference between the contract price and the eventual sales price, are substantially *less* than the deposit.") (emphasis in original).

On a Rule 12(b)(6) motion, the Court need only address whether the facts alleged in the complaint demonstrate any damages to the estate.  Plaintiff need not plead a concrete amount of damages to survive a motion to dismiss.  *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp.2d 265, 271 (D. Conn. 2004) (noting that damages allegations survive a 12(b)(6) motion when the complaint alleges "a tangible injury as a result of the Defendants' actions," even if the damages are not pled "with mathematical precision") (citing *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1171 (9th Cir. 2002)).  While the Trustee's ability to recover the bid deposit as damages is far from clear, the issue cannot be determined at this stage of the proceedings.  The Court finds the damages allegations are sufficient as the Trustee, at the very least, is seeking to recover damages for the time and expenses incurred by the estate while the Court entertained the 64 East bid without knowing the bid was not qualified for submission based on the involvement of the Gianopouloses.  Additionally, at the direction of the Court, once the arrangement between the Gianopouloses and 64 East came to light, the estate incurred substantial expenses investigating the circumstances surrounding the allegedly collusive bid.  These expenses may also be part of compensable damages.

Even if the *Wagoner* rule or the *in pari delicto* doctrine could bar actions by a trustee based on post-petition wrongdoing by a debtor's principals, the factual allegations made by the Trustee in this case also demonstrate a basis for applying the "adverse interest" exception to *Wagoner*.  According to the complaint, the Settlement Agreement

provided that no person related to the Gianopouloses could own direct or indirect interests in the franchises after their sale.  (Compl. ¶¶ 29-30; Exh. A, ¶¶ 5(E), 5(F).)  The Bidding Procedures also contained restrictions against bidding or transfer of the franchises by insiders or relatives of the Debtors.  (Compl. ¶¶ 63-65.)  However, the complaint alleges that the Gianopoulos family was nevertheless involved in a concealed funding arrangement for the 64 East bid, obtaining a $2.6 million loan from Borek to fund the bid, agreeing to split the break-up fee between the Gianopouloses and 64 East, and then later disbursing the majority of the $2.1 million bid deposit back to Stacey and Anne Gianopoulos.  (Compl. ¶¶ 111-119.)  In submitting a bid that allegedly was not qualified pursuant to the terms of the Settlement Agreement and the Bidding Procedures, the complaint alleges that the Gianopouloses acted solely in furtherance of their own interests and against the interests of the Debtors.  This is sufficient to allege that the adverse interest exception to the *Wagoner* rule would apply.  Moreover, the complaint also alleges a basis for finding that the "sole actor" exception to the adverse interest exception would not apply.  As the 64 East bid was made pursuant to a Bankruptcy Code § 363 sale, Court approval of the stalking-horse bid and the break-up fee was required. (Compl. ¶ 94.)  The Gianopouloses were not in total control of the approval of the bid, and were the Court made aware of the Gianopoulos involvement in the 64 East stalking-horse bid, the Court would not have approved the bid, as it was made in violation of the Bidding Procedures.  (Compl. ¶¶ 64, 65, 202, 208.)  Therefore, the complaint alleges a basis for finding *Wagoner* inapplicable to the facts of this case even if *Wagoner* may still generally bar suits by a chapter 11 trustee based on post-petition misconduct by a debtor's principals.  To the extent that factual issues remain regarding application of the

adverse interest and sole actor exceptions, these issues cannot be resolved on a motion to

dismiss.  *In re Adelphia Commc'ns Corp*., 330 B.R. 364, 380 (Bankr. S.D.N.Y. 2005)

(concluding that the creditors committee "has satisfactorily pleaded the facts necessary to

trigger the exception, and that will present an issue of fact, plainly inappropriate for

determination under Rule 12(b)(6)"); *In re Hampton Hotel Investors, L.P.,* 289 B.R. at

578 (denying motion to dismiss based on application of *Wagoner* to pre-petition conduct

because factual allegations in the complaint demonstrated the adverse interest exception

may apply, creating a factual issue for later resolution).

### 3.    Trustee's Standing to Sue for Recovery of the Bid Deposit

Finally, the Rattet Defendants challenge the Trustee's standing to sue on the

grounds that under the Bidding Procedures and Consent Order the Trustee had no right to

retain the bid deposit and she sustained no damage resulting from the return of the

deposit.  Rattet appears to conflate the issue of standing with the issue of damages.

Whether the Trustee does or does not have a right to retain the bid deposit does not raise

a question of the Trustee's standing to bring the causes of action asserted in the

complaint.  Further, even if the Trustee cannot recover the amount of the bid deposit, this

does not foreclose all theories of damages.  Therefore, the determination whether the

Trustee can recover this amount as damages will have to await further developments in

the litigation.

### B.    Analysis of the Sufficiency of the Pleading of the Claims

In addition to arguing that the Trustee lacks standing to sue, the Rattet Defendants

also argue that each of the six causes of action asserted against them fail to state claims

upon which relief may be granted. The court will address the sufficiency of the

allegations supporting each cause of action.

### 1. Count II, Fraudulent Concealment

Under New York law, a fraudulent concealment claim requires that the plaintiff

show the following elements: (i) the concealment of a material fact that the defendant

had a duty by relationship to disclose, (ii) knowledge of the material fact by the party

with the duty to disclose, (iii) non-disclosure of the material fact, (iv) scienter, (v)

justifiable reliance by the claiming party, and (vi) damages. *Zackiva Commc'n Corp. v.*

*Horowitz*, 826 F. Supp. 86, 89 (S.D.N.Y. 1993); *In re Domestic Fuel Corp.*, 79 B.R. 184,

193 (Bankr. S.D.N.Y. 1987).

Recklessness as well as actual knowledge satisfies the knowledge prong for fraud.

*Wilsen Assoc. Real Estate Corp. Inc. v. Pizilly*, 204 A.D.2d 777, 778 (N.Y. App. Div.

1994) (finding recovery available if the attorney knew of or acted recklessly with regard

to the falsity of the statements made); *see also Kountze v. Kennedy*, 147 N.Y. 124, 129

(1895) (stating that "[t]he representation upon which [the fraud claim] is based must be

shown not only to have been false and material, but that the defendant, when he made it,

knew that it was false, or, not knowing whether it was true or false, and not caring what

the fact might be, made it recklessly, paying no heed to the injury which might ensue").

Fraud complaints are also required to include a factual assertion that supports the

inference of scienter, an element that if missing would warrant dismissal. *Credit Alliance*

*Corp. v. Arthur Anderson & Co.*, 65 N.Y.2d 536, 554 (1985). As state of mind may be

alleged generally under FED. R. CIV. P. 9(b), the element of scienter is satisfied either

"(a) by alleging facts to show that defendants had both motive and opportunity to commit

fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d

Cir. 1994). *See also JP Morgan Chase Bank v. Winnick*, 406 F. Supp.2d 247, 252

(S.D.N.Y. 2005) (holding that mental state may be averred generally provided a factual

basis is pled "which gives rise to a strong inference of fraudulent intent") (quoting

*Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)); *Bernstein v. Kelso &

Co., Inc.*, 231 A.D.2d 314, 321-22 (N.Y. App. Div. 1997) (holding that "allegations that

the management defendants schemed with Kelso to induce plaintiff to sell his stock at a

price they deemed lower than a fair value for said stock supported an inference of intent

to deceive plaintiff"). Under New York law, the scienter element is satisfied if the facts

alleged in the complaint support an inference of fraud "based on reckless disregard or

blindness" to the truth. *DaPuzzo v. Reznick*, 14 A.D.3d 302, 303 (N.Y. App. Div. 2005)

(finding the complaint adequate in supporting an inference of fraud based on reckless

disregard or blindness to the true nature of the client's financial condition, which tends to

demonstrate that defendant's opinion was "based on grounds so flimsy as to lead to the

conclusion that there was no genuine belief in its truth") (quoting *Curiale v Peat,

Marwick, Mitchell & Co.*, 214 A.D.2d 16, 28 (N.Y. App. Div. 1995)). The element of

reasonable reliance can only be partially established in the pleadings, with the ultimate

showing of reasonableness a question of fact for trial. *In re Argo Commc'n Corp.*, 134

B.R. 776, 793 (Bankr. S.D.N.Y. 1991).

In addition to the above elements, fraud claims must be dismissed if they fail to

meet the heightened pleading requirements of FED. R. CIV. P. 9(b) in alleging with

particularity the circumstances constituting fraud. Rule 9(b) is satisfied if the complaint

sets forth: (1) what statements were made in what documents or oral misrepresentations

or what omissions were made; (2) the time and place of each such statement and the

person responsible for making (or, in the case of not making) the same; (3) the context of

such statements and the manner in which they misled the plaintiffs; and, (4) what the

defendants obtained as a consequence of the fraud. *Ruff v. Genesis Holding Corp.,* 728 F.

Supp. 225, 227 (S.D.N.Y. 1990). These requirements, however, do not require that fraud

allegations disclose an affirmative statement of fraud, as a concealment or omission of a

material fact is sufficient to support the claim of fraudulent concealment. *Mitschele v.

Schultz*, 826 N.Y.S.2d 14 (App. Div. 2006).

The complaint alleges that the Rattet Defendants had a duty to disclose all

material facts relating to the proposed sale of estate assets by virtue of their positions as

Debtors' counsel and as officers of the Court, including specifically disclosure of any

actual or potential arrangements or agreements with third parties concerning the purchase

of estate property. (Compl. ¶ 142.) With respect to the fraudulent concealment count,

the Rattet Defendants did not argue in their motion to dismiss or in their reply papers that

there was no such duty to disclose. Regardless, as this court discusses at length regarding

the count for breach of fiduciary duty, the Rattet Defendants did owe such a duty to the

estate and to the Court, and accordingly, the requirement for finding a duty to disclose is

satisfied for purposes of this motion to dismiss.

The Rattet Defendants also argue that the complaint fails adequately to plead

scienter. The complaint alleges that the Rattet Defendants "knew or should have known"

of the Gianopouloses' involvement in the 64 East bid, and failed to disclose this material

fact to the Trustee. (Compl. ¶¶ 144, 145); *DaPuzzo*, 14 A.D.3d at 302. An allegation

that a defendant "should have known" is not sufficient to allege recklessness. *IIT v. Cornfeld*, 619 F.2d 909, 924 (2d Cir. 1980) ("The 'or should have known' clause . . . would not qualify under the definition of recklessness . . . ."). Viewed as a whole, as it must be in evaluating a Rule 12(b)(6) motion, *Am. Tissue*, 351 F. Supp.2d at 103 (stating that in considering a Rule 12(b)(6) motion, "the complaint must be viewed as a whole") (citing *Yoder v. Orthomolecular Nutrition Inst. Inc.*, 751 F.2d 555, 562 (2d Cir. 1985)), the complaint alleges much more, easily supporting a strong inference of recklessness by the Rattet Defendants. In light of (1) the overall allegations of the Rattet Defendants' multiple and varied involvement with both the Gianopouloses and Borek in this and other matters, (2) Rattet's preparation of the Auction Motion and Bidding Procedures, (3) Rattet's meetings with the Gianopouloses and Borek regarding the bidding process, (4) Rattet's drafting and hand delivery of the warning letter to Borek, and (5) Rattet's presenting of the 64 East bid to the Court without disclosing that the required certification from the bidder was not obtained, the scienter and knowledge elements of the fraudulent concealment claim have been satisfied. (See Compl. ¶¶ 79-81, 86, 92- 93, 103-105.) The complaint alleges that the estate suffered damages as a result of justifiable reliance on these representations. (Compl. ¶ 146.) The complaint also alleges that the damage suffered was the loss of the bid deposit that was returned based on the fraudulent concealment of relevant information. (Compl. ¶ 147.) Based on these allegations, the complaint alleges sufficient facts to survive the motion to dismiss under the heightened fraud pleading requirements, setting forth in detail the time, place and circumstances of the facts that were concealed. As a result, the motion to dismiss the fraudulent concealment claim is denied.

### 2.  Counts III and Count VI, Conspiracy to Commit Fraudulent Concealment, and Breach of Fiduciary Duty, Respectively

The complaint alleges two claims based on a conspiracy to commit a tort.  Both will be addressed here, as the conspiracy claim at the pleading stage requires the same underlying elements be alleged for each tort.  Under New York law, as a threshold issue to survive a motion to dismiss a conspiracy claim, a plaintiff must sufficiently "allege an actionable underlying tort." *Charney v. Sullivan & Cromwell LLP,* 2007 WL 2822423, at *3 (N.Y. Sup. Ct. Sept. 27, 2007).  If the underlying tort has been alleged then the elements of civil conspiracy are (i) facts constituting a common agreement or understanding, (ii) a common design or purpose to injure the plaintiff, (iii) the tortious or criminal act or acts committed in furtherance of the common agreement and purpose, (iv) the intent and knowledge of the defendants regarding the acts, and (v) damage or injury to the plaintiff as a result of the acts of the defendants. *JP Morgan Chase Bank v. Winnick*, 406 F. Supp.2d at 252; 20 N.Y. JUR. 2d, *Conspiracy*, § 19 (2d ed. 2007).  Under New York law, malice and intent both to participate in the alleged conspiracy and to injure the plaintiff are essential elements in conspiracy actions. *Wegman v. Dairylea Co-op., Inc.*, 50 A.D.2d 108, 114 (N.Y. App. Div. 1975) (finding allegations of personal gain are insufficient for conspiracy claims); *Vom Lehn v. Astor Art Galleries, Ltd.*, 380 N.Y.S.2d 532 (Sup. Ct. 1976); 20 N.Y. JUR.2d, *Conspiracy*, § 3.  Mere allegations of intent to injure or do harm are not sufficient if there is no showing that the action was illegal and without justification or excuse. *Id.*  No lawful acts that were performed in a lawful manner will support an action under conspiracy to commit a tort other than fraud on the court. *Id.*  Unlike the law applicable to fraudulent concealment claims, where recklessness is sufficient to state a claim, New York law requires actual intent by the

defendant to support a conspiracy claim. *Arlinghaus v. Ritenour*, 622 F.2d 629, 640 (2d Cir. 1980) (Friendly, J.) (holding that conspiracy was not established without a showing of "intentional participation with a view to furtherance of the common design") (citing *Bedard v. La Bier*, 194 N.Y.S.2d 216, 220 (Sup. Ct. 1959)). While the complaint in this case, as already explained, adequately pleads recklessness, it fails to plead, with the particularity required by Rule 9(b), facts supporting a strong inference that the Rattet Defendants acted with actual intent to participate in the alleged conspiracy and to injure the plaintiff. (Compl. ¶¶ 152, 153,175, 176.) This is a sufficient basis to dismiss the conspiracy claims, although ordinarily leave to amend would be given in such circumstances. There is another defect in the conspiracy to commit fraudulent concealment claim that leads the Court to dismiss that claim with prejudice.

With respect to Count III, Conspiracy to Commit Fraudulent Concealment, the claim is duplicative of Count II, Fraudulent Concealment against the Rattet Defendants. The same facts were allegedly concealed by all of the defendants. The complaint alleges that the parties agreed, either expressly or impliedly, to keep secret and not disclose the agreement between the Gianopouloses and 64 East. (Compl. ¶¶ 150, 173.) The complaint further alleges that the Rattet Defendants performed specific actions that were alleged in the underlying fraudulent concealment claim. (Compl. ¶¶ 151.) *See Am. Baptist Churches of Metropolitan N.Y. v. Galloway*, 271 A.D.2d 92 (N.Y. App. Div. 2000) (conspiracy claim dismissed as redundant when other claims alleged substantive torts and collusion in committing them). Therefore, this claim will be dismissed with prejudice.

With respect to Count VI, the conspiracy to breach fiduciary duty claim against the Rattet Defendants stands on somewhat different footing, however, to the extent it arises from Rattet's alleged involvement in a conspiracy to breach the Gianopouloses' fiduciary duty.  The complaint alleges that the Gianopouloses, as representatives of a debtor in possession, held fiduciary duties to debtors and debtor's creditors, and further acted as officers of the court, and that Rattet and the Gianopouloses agreed expressly or impliedly to keep the Gianopouloses' involvement in the 64 East bid secret.  (Compl. ¶¶ 171, 173.)  Representatives of a debtor in possession such as the Gianopouloses have fiduciary duties to the estate and its creditors.  *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19, 25-26 (B.A.P. 2d Cir. 1997).  To the extent the Trustee pleads a separate cause of action for conspiracy against the Rattet Defendants based upon the Gianopouloses' breach of fiduciary duty, a valid conspiracy claim can be stated against the Rattet Defendants.  Essentially, the conspiracy claim is used to connect the Rattet Defendants to torts committed by others.  *See Monsanto v. Electronic Data Systems Corp.*, 529 N.Y.S.2d 512, 515 (App. Div. 1993) (stating that "[a] claim of conspiracy does not constitute a substantive tort and may be alleged only to connect a defendant to an otherwise actionable tort").  Therefore, the conspiracy allegations against the Rattet Defendants are not duplicative of other counts in the complaint.

The problem here is that the complaint fails to state with particularity the intent required to state a conspiracy claim.  While the Court is doubtful whether an amended complaint can be filed that satisfies this essential element of the claim, or whether it will really add very much to the case, leave to amend will be granted with respect to the dismissed conspiracy to commit breach of fiduciary duty claim.

### 3. Count IV, Breach of Fiduciary Duty

Count IV of the complaint for breach of fiduciary duty by the Rattet Defendants alleges that as counsel for the debtors in possession, "Rattet and the other attorneys of the Rattet Law Firm performing services for the Debtors, including Pasternak, were fiduciaries of the Debtors and their estates and owed Debtors and their creditors the fiduciary duties of loyalty and care." (Compl. ¶ 159.) In their motion to dismiss, the Rattet Defendants argue that the breach of fiduciary duty claim must be dismissed because Rattet did not owe any fiduciary duty to the Debtors or the estate. They also argue that "[a]s counsel for the debtors, the Rattet Firm had no obligation to ensure its clients' compliance with agreements, such as the Settlement Agreement with Dunkin' Donuts that the Gianopouloses would have no ownership rights in Dunkin' Donuts franchises." (*See* ECF Doc. No. 21, at 27-28.) For the reasons explained below, the Court rejects the Rattet Defendants argument that they were not subject to a duty to the Debtors and the estate.

### a. The Existence of a Duty on the Part of the Rattet Defendants

The Court does not have to assume as true the existence of a duty just because a plaintiff alleges it in a complaint. The existence of a duty is a legal conclusion for the court to decide. *Weigand v. Univ. Hosp. of N.Y. Univ. Med. Ctr.*, 659 N.Y.S.2d 395, 397 (Sup. Ct. 1997) ("[A]bsent legislative intervention, the fixing of the 'orbit' of duty . . . is the responsibility of the courts.") (quoting *De Angelis v. Lutheran Med. Ctr.*, 58 N.Y.2d 1053, 1055 (1983)); s*ee Sec. Investor Protection Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999) (stating that "courts are free to disregard legal conclusions, deductions or opinions couched as factual allegations"). Courts in New

York have considered the existence of a duty at the motion to dismiss stage. *See, e.g.,*

*Shaya B. Pacific, LLC v. Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P*, 827

N.Y.S.2d 231, 234 (App. Div. 2006) (stating that if, as a matter of law, defendant did not

owe plaintiff a duty, case could not survive a motion to dismiss). Under New York law, a

fiduciary relationship exists when "one has reposed trust or confidence in the integrity or

fidelity over another who thereby gains a resulting superiority of influence over the first,

or when one assumes control and responsibility over another." *Reuben H. Donnelley*

*Corp. v. Mark I Mktg. Corp.,* 893 F. Supp. 285, 289 (S.D.N.Y. 1995); *see also Am.*

*Tissue*, 351 F. Supp.2d at 102 ("A fiduciary duty arises under New York law wherever

one person is under a duty to act for or give advice for the benefit of another upon matters

within the scope of the relation.") (quoting *Flickinger v. Harold Brown & Co.*, 947 F.2d

595, 599 (2d Cir. 1991) (internal quotations omitted)).

The Rattet Defendants' argument that they did not owe a fiduciary duty to its

clients – the debtors in possession – is meritless. Every lawyer owes its client a fiduciary

duty to act with reasonable competence and diligence. *See* RESTATEMENT (THIRD) OF

THE LAW GOVERNING LAWYERS § 16(2) (2000) ("LAW GOVERNING LAWYERS") ("a

lawyer must, in matters within the scope of the representation . . . (2) act with reasonable

competence and diligence"); *id.* cmt. b ("A lawyer is a fiduciary, that is, a person to

whom another person's affairs are entrusted in circumstances that often make it difficult

or undesirable for that other person to supervise closely the performance of the fiduciary.

Assurances of the lawyer's competence, diligence, and loyalty are therefore vital.").[12]

---

[12]    Indeed, claims against lawyers for breach of fiduciary duty or professional negligence are for most
practical purposes the same claim with different labels. *See Am. Tissue*, 275 F. Supp.2d at 405 n.7
("Although ATI brings claims for malpractice, breach of contract, and breach of fiduciary duty, these three
causes of action boil down to one claim for the provision of deficient . . . services.") (citing *Wechsler v.*

The existence of fiduciary duty of the debtor's counsel to the estate (as opposed to the duty to the debtor in possession) stands on somewhat different footing and has been the subject of conflicting decisions among bankruptcy and district courts.  The Second Circuit has not resolved the issue.  Judge Brozman, writing for the then-existing Second Circuit Bankruptcy Appellate Panel in *In re JLM, Inc.*, 210 B.R. at 25-26, concluded that "[b]oth management and its counsel have fiduciary duties to an estate in bankruptcy." More recently, Judge Drain concluded that "[a]n attorney for a chapter 11 debtor cannot simply close his or her eyes to matters having an adverse legal and practical consequence for the estate and creditors.  Instead, [t]he debtor's attorney, while not a trustee, nevertheless is charged with the duty of counseling the debtor in possession to comply with its duties and obligations under the law."  *In re St. Stephen's 350 East 116th St*, 313 B.R. 161, 171 (Bankr. S.D.N.Y. 2004) (quoting *In re JLM, Inc.*, 210 B.R. at 25-26) (internal quotations omitted).  In an earlier case, *In re Cenargo Intern., PLC*, 294 B.R. 571 (Bankr. S.D.N.Y. 2003), Judge Drain said the issues "[w]hether counsel to a debtor in possession has a fiduciary duty to the estate and creditors (as opposed to a duty to a client that has a fiduciary duty to the estate and creditors), and the extent of such a duty, are developing concepts, in part because the articulation of an overly broad duty might

---

*Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 39 (S.D.N.Y. 1997) ("The Trustee's three causes of action-legal malpractice, breach of contract and breach of fiduciary duty-essentially amount to a single claim for the provision of deficient legal services."); *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 241 (S.D.N.Y. 1987) ("the allegations of the debtor here, although brought under many different theories, all sound in malpractice.  We find that . . . claims of . . . malpractice, . . . [and] breach of fiduciary duty . . . allege what is essentially 'a single form of wrongdoing under different names.' . . .  For purposes of this motion to dismiss, we will therefore consider this to be in essence an action in malpractice.")).  *See also Hirsch*, 72 F.3d at 1092; *Wagoner*, 944 F.2d at 119.  *See* LAW GOVERNING LAWYERS § 49 cmt. c ("Many claims brought by clients against lawyers can reasonably be classified either as for breach of fiduciary-duty or for negligence without any resulting difference.  For example, the duty of care enforced in a negligence action is also a fiduciary duty . . . ; likewise, the specific duties of lawyers help define both their fiduciary obligations and the contents of their duty of care.  Most rules applicable to negligence actions also apply to actions for breach of fiduciary duty.  Pleaders typically add a fiduciary-duty claim to a negligence count for reasons of rhetoric or completeness.").

impose an unwarranted strain on the attorney-client relationship and the attorney-client privilege. 294 B.R. at 599 & n.33.[13]   In another recent case in this district, Judge Hardin concluded that the debtor's counsel owes a duty to the court and the estate. *In re St. Vincent's Catholic Med. Ctrs. of N.Y.,* Case No. 05-14945, slip op., 2007 WL 2492787, at *16 (Bankr. S.D.N.Y. Aug. 29, 2007) ("Complete and timely disclosure of all relevant and material information and documents lies at the heart of the bankruptcy process.  This is particularly so in a Chapter 11 case, where the Creditors' Committee and the U.S. Trustee's office, each with fiduciary duties of their own, must have confidence and trust in the debtor and its professionals.").

The majority rule is that the attorney for a debtor in possession is a fiduciary of the estate. *See In re Count Liberty, LLC*, 370 B.R. 259, 280-81 (Bankr. C.D. Cal. 2007) ("According to the majority of courts addressing this issue, an attorney for a debtor in possession is a fiduciary of the bankruptcy estate.") (collecting cases).  The Rattet

---

[13]     Judge Drain collected many of the authorities on the issue in his footnote 33:

*See, e.g.,* C.R. Bowles, Jr. & Nancy B. Rapoport, *Has the DIP's Attorney Become the Ultimate Creditors' Lawyer in Bankruptcy Reorganization Cases?,* 5 AM. BANKR.INST. L.REV. 47, 59-68 (1997) (hereafter "*Bowles & Rapoport*") (citing numerous cases holding that counsel to a debtor in possession has such an independent duty, including, in certain instances, to act contrary to the client's instructions even if the client is not about to commit a crime or a fraud, but noting that the parameters of such duty are unclear). *Contrast In re Sky Valley, Inc.,* 135 B.R. 925, 938-39 (Bankr. N.D. Ga.1992) ("The unique circumstances which surround insolvency and the filing of a Chapter 11 case place the attorney for the debtor in possession in the unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client. . . . The attorney for a debtor in possession is not merely a mouthpiece for his client.") *with Hansen, Jones & Leta, P.C. v. Segal,* 220 B.R. 434, 467 (D. Utah 1998) (rejecting majority view that counsel has an independent duty to estate and creditors); *see also ICM Notes, Ltd. v. Andrews & Kurth, L.L.P,* 278 B.R. 117, 126 (S.D. Tex. 2002), *aff'd* 324 F.3d 768 (5th Cir. 2003) (while counsel may have a duty to estate and creditors in general, counsel does not have a fiduciary duty to particular creditors); *In re Sidco, Inc.,* 173 B.R. 194 (E.D. Cal. 1994) (attorney's independent duty to estate exists only in unusual circumstances; basic tenet is that attorney has fiduciary duty only to client, the debtor in possession).

*In re Cenargo Intern., PLC,* 294 B.R. at 599 n.33.

Defendants – without acknowledging that they espouse the minority view – rely primarily on *Hansen, Jones & Leta, P.C. v. Segal,* 220 B.R. 434, 467 (D. Utah 1998), which questioned the basis for finding that the debtor's counsel owed a fiduciary duty to the estate. The *Hansen* case cites approximately a dozen other cases holding that the attorney is a fiduciary of the estate, but dismisses these decisions as "curiously undefined" and incorrectly relying either on findings that (1) an attorney for a debtor in possession is a client of the estate, rather than the debtor in possession, or (2) that the attorney holds a fiduciary duty to the estate stemming from the debtor in possession's own fiduciary duty to the estate. *See Count Liberty*, 370 B.R. at 280 (citing *Hansen*, 220 B.R. at 449). *Hansen*, of course, is not binding on this court. As pointed out in the *Count Liberty* decision, *Hansen* does not address holdings by the Fifth and Seventh Circuits that are contrary to *Hansen, see In re Taxman Clothing Co.,* 49 F.3d 310, 314 (7th Cir. 1995) ("A lawyer hired by a trustee in bankruptcy to do legal work for the estate, like the trustee himself, is a fiduciary of the estate."); *Continental Ill. Nat'l Bank & Trust Co. of Chi. v. Charles N. Wooten, Ltd. (In re Evangeline Ref. Co.),* 890 F.2d 1312, 1323 (5th Cir. 1989) (stating that "trustees and attorneys for trustees are held to high fiduciary standards of conduct"); *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.),* 785 F.2d 1249, 1256 n.7 (5th Cir. 1986) (observing that "court-appointed attorneys are officers of the court and fiduciaries"); nor does it address Supreme Court precedent recognizing that "[i]n all cases persons who seek compensation for services or reimbursement for expenses [from the court] are held to fiduciary standards." *Brown v. Gerdes*, 321 U.S. 178, 182 (1944) (holding that bankruptcy courts have exclusive jurisdiction to fix reasonable compensation to be paid to attorneys representing a debtor

in possession, partly because of disclosure obligations to the court and partly because of the potential damage to the estate if compensation were not reviewed).

The Rattet Defendants are correct to a point in arguing that they had no obligation to *"ensure"* its clients' compliance with agreements. "While counsel's duty to the estate may not rise to the level of a policeman for the debtor's post-petition conduct, an attorney for the debtor in possession has fiduciary obligations to the estate stemming from his fiduciary obligations to the debtor in possession and his responsibilities as an officer of the court." *Count Liberty*, 370 B.R. at 281. As Judge Drain concluded in *In re St. Stephen's 350 East 116th St*, 313 B.R. at 171, the attorney "cannot simply close his or her eyes to matters having an adverse legal and practical consequence for the estate and creditors." That is essentially the allegation made against the Rattet Defendants in the complaint.

This Court need not decide the full scope of the Rattet Defendants' fiduciary duties to the estate. The scope of such duties is certainly narrower than a lawyer's duties to its client. A lawyer owes a duty to a nonclient, and can be held liable for breach, in narrower circumstances. Applying the rule in LAW GOVERNING LAWYERS § 51(4), a lawyer owes a duty of care, and may be liable for breach,

> (4) to a nonclient when and to the extent that:
> (a) the lawyer's client is a trustee, guardian, executor, or fiduciary acting primarily to perform similar functions for the nonclient;
> (b) the lawyer knows that appropriate action by the lawyer is necessary with respect to a matter within the scope of the representation to prevent or rectify the breach of a fiduciary duty owed by the client to the nonclient, where (i) the breach is a crime or fraud or (ii) the lawyer has assisted or is assisting the breach;
> (c) the nonclient is not reasonably able to protect its rights; and
> (d) such a duty would not significantly impair the performance of the lawyer's obligations to the client.

This rule while not specifically described as applying to the bankruptcy context nevertheless provides a good fit to the circumstances of counsel for a debtor in possession. First, the lawyer's client, the debtor in possession, is a fiduciary for the estate and its creditors. *Count Liberty*, 370 B.R. at 275 (collecting cases). Second, a lawyer for a debtor in possession "bears a heightened duty of care to ensure the integrity of the bankruptcy process where, by definition, a debtor in possession is not disinterested, and counsel for a debtor in possession must be disinterested, free from any adverse entanglements which could cloud its judgment respecting what is best for the estate." *Id.* at 281 (quoting *In re JLM, Inc.*, 210 B.R. at 26). Third, the alleged misconduct by the debtors in possession's principals in this case involves a breach of fiduciary duty and fraud. Fourth, by preparing and presenting the Auction Motion, Bidding Procedures and the 64 East bid, the Rattet Defendants have assisted in the alleged breach, intentionally or otherwise. LAW GOVERNING LAWYERS § 51 cmt. h ("A lawyer assists fiduciary breaches, for example, by preparing documents needed to accomplish the fiduciary's wrongful conduct or assisting the fiduciary to conceal such conduct."). Fifth, the estate is not reasonably able to protect its rights where it has been disserved by the debtor in possession and its counsel. Sixth, the duty imposed does not significantly impair the performance of the lawyer's obligations. As Judge Brozman wrote in *In re JLM, Inc.*, "because counsel for the debtor in possession has fiduciary obligations not ordinarily foisted upon the attorney-client relationship, the attorney for the debtor in possession may not simply resign where the client refuses the attorney's advice concerning the client's fiduciary obligations to the estate and its creditors. Counsel must do more, informing the court in some manner of derogation by the debtor in possession." *In re JLM, Inc.*, 210

B.R. at 26.  The risk of interfering with the attorney-client relationship is further limited

when it is a chapter 11 trustee who asserts a claim against the debtor in possession's

former counsel.  Upon the appointment of a chapter 11 trustee the power to control the

attorney-client privilege passes to the trustee.  *Commodity Futures Trading Comm'n v.*

*Weintraub*, 471 U.S. 343, 354 (1985) ("In summary, we conclude that vesting in the

trustee control of the corporation's attorney-client privilege most closely comports with

the allocation of the waiver power to management outside of bankruptcy without in any

way obstructing the careful design of the Bankruptcy Code.").  *See also* LAW GOVERNING

LAWYERS § 51 cmt. h ("The duty arises from the fact that a fiduciary has obligations to

the beneficiary that go beyond fair dealing at arm's length.  A lawyer is usually so

situated as to have special opportunity to observe whether the fiduciary is complying with

those obligations.  Because fiduciaries are generally obliged to pursue the interests of

their beneficiaries, the duty does not subject the lawyer to conflicting or inconsistent

duties.  A lawyer who knowingly assists a client to violate the client's fiduciary duties is

civilly liable, as would be a nonlawyer . . . .  Moreover, to the extent that the lawyer has

assisted in creating a risk of injury, it is appropriate to impose a preventive and corrective

duty on the lawyer . . . .").

The duty imposed by the rule in § 51(4) and adopted by the Court in this case

arises "when the lawyer knows that appropriate action by the lawyer is necessary to

prevent or mitigate a breach of the client's fiduciary duty."  *Id.*  But as comment h to § 51

makes clear, "know" is "functionally the same as the terminology 'has reason to know'"

defined in RESTATEMENT (SECOND) TORTS § 12(1).  *Id.*  Section 12(1) defines "reason to

know" to "denote the fact that the actor has information from which a person of

reasonable intelligence or of the superior intelligence of the actor would infer that the fact

in question exists, or that such person would govern his conduct upon the assumption that

such fact exists."  *Id.*; *see also id.* cmt. c ("'Reason to know' means that the actor has

knowledge of facts from which a reasonable man of ordinary intelligence or one of the

superior intelligence of the actor would either infer the existence of the fact in question or

would regard its existence as so highly probable that his conduct would be predicated

upon the assumption that the fact did exist.").  Thus, actual knowledge by the Rattet

Defendants is not required to impose liability predicated on this theory.  The Rattet

Defendants cannot escape liability if they closed their eyes to what someone with their

"superior intelligence" would find obvious.  But, importantly for the Rattet Defendants,

"'knows' neither assumes nor requires a duty of inquiry."  LAW GOVERNING LAWYERS §

51 cmt. h.  Thus, the Trustee cannot predicate liability for breach of fiduciary duty to the

estate on the Rattet Defendants' failure to investigate facts beyond those of which they

were otherwise aware.

Here the Rattet Defendants prepared the Auction Motion and Bidding Procedures,

presented them to the Court for approval, and then presented and obtained court approval

for the 64 East bid without disclosing that the required certification by 64 East was not

obtained.  Once the Rattet Defendants chose to speak in connection with the proposed §

363 sale, they owed a fiduciary duty to the Court and all of the Debtors' constituencies to

speak truthfully, and to correct any misstatements or material omissions they

subsequently discovered.  *In re JLM, Inc.*, 210 B.R. at 26 ("Counsel must do more,

informing the court in some manner of derogation by the debtor in possession."); *In re St.

Stephen's 350 East 116th St*, 313 B.R. at 171 ("An attorney for a chapter 11 debtor

cannot simply close his or her eyes to matters having an adverse legal and practical

consequence for the estate and creditors."); *In re Wild Horse Enters., Inc.*, 136 B.R. 830,

840 (Bankr. C.D. Cal. 1991) ("[T]he attorney may not simply close his or her eyes to

matters having a legal and practical consequence for the estate-especially where the

consequences may have an adverse effect."). *See also* N.Y. DR 7-102(a)(5), 22 NYCRR

§ 1200.33 ("In the representation of a client, a lawyer shall not knowingly make a false

statement of law or fact."); N.Y. DR 7-102(b)(2), 22 NYCRR § 1200.33 ("A lawyer who

receives information clearly establishing that a person other than the client has

perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal.").[14]

While N.Y. DR 7-102(a)(5) speaks of "knowingly" making a false statement, the

applicable standard is satisfied where a lawyer ignores what is plainly evident.[15] N.Y.

DR 7-102 is a disciplinary rule and not a rule creating civil liability. *See* LAW

GOVERNING LAWYERS § 52(2)(a) ("Proof of a violation of a rule or statute regulating the

conduct of lawyers: (a) does not give rise to an implied cause of action for professional

negligence or breach of fiduciary duty . . . ."). Violation of disciplinary rules may,

however, be considered by the Court in assessing whether civil liability should be found

---

[14]    Neither the Gianopouloses nor Borek who allegedly committed a fraud were Rattet's clients in this bankruptcy case. Therefore, N.Y. DR 7-102(b)(1), applicable when a *client* has perpetrated a fraud, and requiring the lawyer first to remonstrate with the client to rectify the fraud before disclosing it to a tribunal, does not apply in this matter.

[15]    *See generally* LAW GOVERNING LAWYERS § 120(1)(b) ("A lawyer may not knowingly make a false statement of fact to the tribunal."); *id.* cmt. c ("*A lawyer's knowledge.* . . . A lawyer's knowledge may be inferred from the circumstances. Actual knowledge does not include unknown information, even if a reasonable lawyer would have discovered it through inquiry. However, a lawyer may not ignore what is plainly apparent, for example, by refusing to read a document . . . . A lawyer should not conclude that testimony is or will be false unless there is a firm factual basis for doing so. Such a basis exists when facts known to the lawyer or the client's own statements indicate to the lawyer that the testimony or other evidence is false."). The Reporter's Note to cmt. c recognizes that some courts have applied a "conscious ignorance" test for knowledge, citing *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590 (9th Cir. 1983) (in view of other facts known to the law firm, it could not accept at face value client's denial of known fact).

for breach of fiduciary duty.[16]  *See id.* § 52(2)(c) ("Proof of a violation of a rule or statute

regulating the conduct of lawyers: (c) may be considered by a trier of fact as an aid in

understanding and applying the standard of [care] to the extent that (i) the rule or statute

was designed for the protection of persons in the position of the claimant and (ii) proof of

the content and construction of such a rule or statute is relevant to the claimant's claim.").

The Trustee's complaint alleges that the Rattet Defendants, despite being aware of

an "innuendo" of an improper relationship, failed to disclose the absence of the required

certification from 64 East, a requirement the Rattet Defendants drafted.  The Rattet

Defendants ascribe their failure to disclose as an "administrative oversight."  This may

have been a case of ignoring what was plainly apparent.  Assuming the other elements of

the breach of fiduciary duty claim are satisfied, the Rattet Defendants can be found liable

on this claim.

### b.  Breach of Fiduciary Duty

Under New York law, a claim alleging breach of fiduciary duty must set forth

three elements: (i) the existence of a fiduciary relationship, (ii) the breach of the fiduciary

duty, and (iii) damages resulting from the breach.  *SCS Commc'ns, Inc. v. Herrick Co.,

Inc.*, 360 F.3d 329, 342 (2d Cir. 2004); *In re Grumman Olson Ind., Inc.*, 329 B.R. 411

(Bankr. S.D.N.Y. 2005) (collecting cases).  The Rattet Defendants allege that the

complaint fails on its face because none of the elements for breach of fiduciary duty were

alleged, that Rattet did not owe a fiduciary duty to the estate, and, alternatively, if a

fiduciary duty and subsequent breach is found, the damages are limited exclusively to the

---

[16]     While N.Y. DR 7-102(b)(2) requires evidence "clearly establishing" that a fraud has been
committed to find a disciplinary violation for nondisclosure, the burden of proof for imposing civil liability
is a preponderance of the evidence.

compensation received by the firm as Debtors' counsel. The Court has concluded above that a fiduciary duty existed.

In the bankruptcy context a threshold fiduciary requirement is counsel's duty to establish its qualification as a party with no conflicts of interest and the maintenance of that qualification throughout the case. *In re Angelika Films 57th, Inc.,* 227 B.R. 29, 37 (Bankr. S.D.N.Y. 1998). This responsibility is included in Bankruptcy Code § 327(a), requiring that an attorney must meet a two-prong test to be considered qualified: (i) the attorney must not hold or represent an interest adverse to the bankruptcy estate, and (ii) the attorney must be a disinterested person. *In re Angelika Films 57th, Inc.,* 227 B.R. at 37 (citing *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 531 (Bankr. S.D.N.Y. 1994)). An interested party has been defined as one who has "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors – an incentive sufficient to place those parties at more than acceptable risk – or the reasonable perception of one." *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987); *In re Leslie Fay Cos.*, 175 B.R. at 533. Counsel is said to represent an interest adverse to the estate when representing an interest that either is in possession of an economic interest that would tend to lessen the value of the estate or create an actual or potential dispute with the estate as a rival counsel or a predisposition of bias against the estate. *In re Angelika Films 57th, Inc.,* 227 B.R. at 38 (citing *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998)). The principals and the debtor in possession have such an adverse interest for conflict purposes when counsel begins to advocate for or represent the principals' interests in ways that are at the expense of the estate. *In re Angelika Films 57th, Inc.,* 227 B.R. at 40 (finding attorney actions which benefited the principal, who was the sole shareholder of a closely

held corporation, put at risk the benefits to the estate previously achieved and was therefore an actual conflict); *see also In re Greene*, 138 B.R. 403, 409 (Bankr. S.D.N.Y. 1992) (finding attorney's resistance to conversion from chapter 11 was a delaying action intended not to benefit the estate but to benefit the debtors); *Bergrin v. Eerie World Entm't, L.L.C.*, No. 03 Civ. 4501, 2003 WL 22861948, at *2 (Bankr. S.D.N.Y. 2003) (finding counsel for a chapter 11 debtor owes a fiduciary duty of loyalty and care to his client, the debtor in possession, and the estate, but not to the debtor's principals).

In this case, the Trustee alleges that the Rattet Defendants were conflicted because of the undisclosed prior relationship with the Gianopouloses, and, once Borek entered this case to consider and then bid on FMG's assets, the undisclosed existing relationship between the Rattet Defendants and Borek and his various business entities. *See* FED. R. BANKR. P. 2014(a); *see also* the discussion *supra* at 10-11 & nn.6, 7. It is by no means clear that the Rattet Defendants violated their fiduciary duties in their disclosures concerning their connections with the Gianopouloses and Borek, but the Trustee has alleged sufficient facts to state a claim for breach of fiduciary duty based on these disclosure issues.

The Trustee also alleges that the Rattet Defendants breached their fiduciary duties by (a) failing to disclose the alleged involvement of the Gianopouloses in the bidding for Debtors' assets; (b) failing diligently to investigate matters concerning the Gianopouloses' involvement in the bidding for Debtors' assets after an "innuendo" of improper conduct came to their attention[17]; (c) failing properly to counsel and supervise the Debtors and their principals to ensure they complied with their duties and obligations

---

[17] The Court has concluded that the Rattet Defendants did not owe a fiduciary duty to the estate to investigate facts beyond those of which they were aware. *See supra* at 48.

under the Bankruptcy Code and the orders entered by the court; (d) failing to disclose the

Rattet Defendants' alleged role as agent for Borek and/or 64 East; (e) failing to ensure

that the bid submitted by 64 East was a "Qualified Bid" that included an executed Bidder

Registration Form and financial information, and was "a good faith, bona fide, offer to

purchase"; (f) failing to ensure that the bid submitted by 64 East complied with the terms

of the Settlement Agreement and this Court's February 22, 2005 Order adopting and

implementing the Bidding Procedures; (g) causing or allowing the Rattet Defendants to

represent the Debtors while simultaneously serving as attorney and/or agent for Borek

and entities owned or controlled by him; (h) failing to disclose "connections" with

entities owned or controlled by the Gianopouloses; and (i) failing to disclose

"connections" with entities owned or controlled by Borek.  (Compl. ¶ 163.)  The

complaint also alleges that the Rattet Defendants knowingly withheld material

information from the concerned parties and that omission was to the detriment of the

estate in that it placed the estate at risk of violating the Court's Orders and being exposed

to sanctions or other actions.  (Compl. ¶¶ 76, 85.)

As for the Rattet Defendants' argument that, assuming a breach of fiduciary

duties, damages are limited to disgorgement of the interim fees they received while the

firm was counsel to the debtors-in-possession (approximately $800,000), there is no basis

now to hold that damages are limited to such relief.  Under New York law, the so-called

faithless servant doctrine requires disgorgement of all compensation received after the

date the disloyalty began.  *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d

184, 200 (2d Cir. 2003) (explaining that "an agent is obligated to be loyal to his employer

and is prohibited from acting in any manner inconsistent with his agency or trust and is at

all times bound to exercise the utmost good faith and loyalty in the performance of his

duties.  One who owes a duty of fidelity to a principal and who is faithless in the

performance of his services is generally disentitled to recover his compensation, whether

commissions or salary.  Moreover, a principal is entitled to recover from his unfaithful

agent any commission paid by the principal.  It does not make any difference that the

services were beneficial to the principal, or that the principal suffered no provable

damage as a result of the breach of fidelity by the agent.") (internal quotations and

citations omitted).

Bankruptcy law also gives a court wide discretion in fixing a remedy for breach of

fiduciary duties by a bankruptcy professional.  *In re Leslie Fay Cos.,* 175 B.R. at 538-

539.  The available remedies range from sanctions or the refusal, reduction, or

disgorgement of attorney fees.  *In re Granite Partners, L.P.*, 219 B.R. at 40-43.  Courts

have found that the failure to make adequate disclosures may result in a sanction or

reduction in fees as the bankruptcy system is harmed, even in the absence of actual harm

to the estate.  *In re LSS Supply Inc.*, 247 B.R. 280, 283 (Bankr. D. Ariz. 2000).  The most

common remedy for breach of the debtor in possession's counsel's fiduciary duties has

been disgorgement or reduction in attorneys' fees.  *In re JLM, Inc.*, 210 B.R. at 21; *In re

Angelika Films 57th, Inc.,* 227 B.R. at 44-45; *In re Greene*, 138 B.R. at 408-409.  The

Trustee could well have an easier time obtaining disgorgement or reduction of fees by

challenging Rattet's fees under Bankruptcy Code § 330 in the bankruptcy case, without

the necessity of pursuing the claims asserted in this adversary proceeding.  But the

Trustee has chosen a different course bringing the claims included in the adversary

complaint.

The Rattet Defendants have offered no authority – and the Court is aware of none – for the proposition they espouse limiting the Trustee to fee disgorgement if the Trustee can establish liability for breach of fiduciary duty and damages in a larger amount. Indeed, courts have recognized the availability of compensatory sanctions for the full amount of the loss to an estate resulting from an attorney's breach of fiduciary duty. In *Count Liberty*, 370 B.R. at 286, for example, the court required the attorney to pay compensatory sanctions to the estate in the amount of the loss to the estate, and to a creditor for attorney fees. *Id*. Additionally, the court reserved a possible fee disgorgement and/or reduction pending a hearing on the attorney's final application for the allowance of fees. *Id.* at 287-288.

Based on the foregoing, it is clear that the Trustee has adequately pleaded a claim for breach of fiduciary duty by the Rattet Defendants.

### 4. Count IX, Negligence

Under New York law, in order to state a claim for negligence sufficient to withstand a motion to dismiss, a plaintiff's complaint must allege: (i) the existence of a duty owed by defendant to plaintiff; (ii) breach of this duty; (iii) resultant injury to plaintiff; and, (iv) a causal relationship between defendant's conduct and plaintiff's injury. *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998); *Reed Intern. Trading Corp. v. Donau Bank AG*, 866 F. Supp. 750, 756 (S.D.N.Y. 1994); *McCluskey v. United States*, 583 F. Supp. 740, 749 (S.D.N.Y. 1984); *Livingston v. Gribetz*, 549 F. Supp. 238, 242 (S.D.N.Y. 1982). Similarly, an action for legal malpractice due to negligence requires proof of three elements: (1) that the attorney was negligent; (2) that such negligence was a proximate cause of plaintiff's losses; and (3) proof of actual damages. *Brooks v. Lewin,*

21 A.D.3d 731, 734 (N.Y. App. Div. 2005); *Prudential Ins. Co. of Am. v Dewey, Ballantine, Bushby, Palmer & Wood*, 170 A.D.2d 108, 114 (N.Y. App. Div. 1991), *aff'd* 80 N.Y.2d 377 (N.Y. 1992); *Engelke v. Brown, Rudnick, Berlack, Israels, L.L.P.*, No. 114511/05, 2006 W.L. 2828886, at *6 (N.Y. Sup. Ct. Aug. 2, 2006).

The Rattet Defendants' only argument in support of the motion to dismiss the negligence claim is *in pari delicto*.  The Court has already addressed and rejected that argument earlier in this opinion.  *See* Section III.A.2., *supra* at 16, *et seq*.  The negligence count focuses on completely separate alleged misconduct by the Gianopouloses – their alleged post-petition transfers of approximately $1.3 million.  (Compl. ¶ 193.)  No details about the transfers are provided in the complaint.  The complaint alleges that the Rattet Defendants failed to exercise ordinary care, skill and knowledge, and breached fiduciary duties, by failing to advise the Debtors and to assist in their compliance with their duties under the Bankruptcy Code.  (Compl. ¶ 194.)  The allegations in the complaint are sufficient to allege a claim for professional negligence.

### 5.  Count X, Fraud on the Court

A "fraud on the court" encompasses conduct that prevents the court from fulfilling its duty of impartially deciding cases.  *In re Clinton Street Food Corp.*, 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000).  Rather than being limited to injury to an individual litigant, fraud on the court embraces "that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases presented for adjudication."  *Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972).

Successfully alleging fraud on the court requires (1) a misrepresentation to the court by the defendant; (2) a description of the impact the misrepresentation had on proceedings before the court; (3) a lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and (4) the benefit the defendant derived from the misrepresentation. *In re Ticketplanet.com*, 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004) (citing *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 899-900 (2d Cir. 1985)). An attorney's knowledge or sponsorship of misdeeds by their clients, including a client's nondisclosure of material information when appearing before a court, may be grounds for alleging fraud on the court against the attorney. *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118-19 (6th Cir. 1976) (noting that allegations regarding an attorney's knowledge and/or sponsorship of a client's inconsistent testimony at trial and failure to disclose known, material documents in discovery could constitute fraud on the court, but finding no evidence thereof on the record to support relief from judgment under FED. R. CIV. P. 60(b)); *see also Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238 (1944) (holding that Court of Appeals could vacate its own judgment of patent infringement, long after the court's term ended, upon proof that (1) the plaintiff in a patent infringement case was the true author of an article used to support the validity of the patent, (2) plaintiff's attorney failed to disclose this fact to the Court of Appeals while the case was pending, and (3) the article was used by the Court of Appeals as a basis for reversing a previous district court decision holding the patent was invalid after the district court did not consider the article in rendering its decision), *overruled on other grounds by Standard Oil of Cal. v. United States*, 429 U.S. 17, 18 (1976).

The discussion above of the breach of fiduciary duty claim demonstrates that the same allegations also support the fraud on the court claim. In the context of the § 363 sale, where the Rattet Defendants drafted and presented the Auction Motion and Bidding Procedures, and also presented the auction bids for Court approval, the Rattet Defendants were required to disclose all material facts to the Court. This averment of the Rattet Defendants' duty also appears in Count X of the complaint, particularly as it pertains to the general duty of an officer of the court. (Compl. ¶ 199.) The Trustee further alleges that, but for the Rattet Defendants' failure to disclose the Gianopouloses' involvement in the 64 East bid to the Court, the Trustee, or the Examiner, and the failure to discover the Gianopouloses' involvement until mid-March 2006, well after the sale took place and the bid deposit was returned, the $2.1 million bid deposit would not have been returned and the Rattet Defendants, Borek, and the Gianopouloses would not have benefited from the auction process. (Compl. ¶¶ 202-03, 205-08.)

If the Trustee successfully establishes that the Rattet Defendants had knowledge of and failed to disclose material facts concerning the auction of estate assets, the Trustee may recover for fraud on the court. It is not clear that the Trustee would be entitled to any remedy not otherwise available on one of the other claims but that is not a basis to dismiss the claim on the Rule 12(b)(6) motion.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the Trustee has standing to assert the claims included in the complaint against the Rattet Defendants. Neither the *in pari delicto* doctrine nor the *Wagoner* rule apply to bar claims based on the post-petition conduct alleged in this case. The Rattet Defendants' motion to dismiss is denied as to

Counts II (Fraudulent Concealment), IV (Breach of Fiduciary Duty), IX (Negligence) and X (Fraud on the Court).  The motion to dismiss is granted without leave to amend as to Count III (Conspiracy to Commit Fraudulent Concealment), because the claim fails to plead the intent requirement of the conspiracy claim with particularity as required by Rule 9(b), and it is duplicative of Count II (Fraudulent Concealment).  The motion to dismiss is granted with leave to amend within twenty (20) days from the date of this Order as to Count VI (Conspiracy to Breach Fiduciary Duty), to permit the Trustee to attempt to replead the intent element in the manner required by Rule 9(b).  The Rattet Defendants shall answer the complaint within twenty (20) days from the date of this Order with respect to Counts II, IV, IX and X.  If the Trustee files an amended complaint with respect to Count VI (Conspiracy to Breach Fiduciary Duty), the Rattet Defendants shall file a responsive pleading (*e.g.*, an answer or motion to dismiss) within twenty (20) days after the Trustee files an amended complaint as to Count VI.

The parties shall appear for a Case Management Conference on February 26, at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: January 23, 2008
     New York, New York

                    **/s/Martin Glenn**
                THE HONORABLE MARTIN GLENN
                UNITED STATES BANKRUPTCY JUDGE